**STATE of Missouri, Respondent,**

v.

**Travis E. GLASS, Appellant.**

**No. SC 85128.**

Supreme Court of Missouri,
En Banc.

June 8, 2004.

Rehearing Denied July 1, 2004.

As Modified on Denial of Rehearing
July 1, 2004.

**500**

Deborah B. Wafer, Office of State Public Defender, St. Louis, for Appellant.

Jeremiah W. (Jay) Nixon, Atty. Gen., Adriane D. Crouse, Asst. Atty. Gen., Jefferson City, for Respondent.

WILLIAM RAY PRICE, JR., Judge.

A jury convicted Travis Glass of one count of first degree murder and recommended a sentence of death. Section 565.020.[1] Judgment was entered consistent with the jury recommendation. This Court has jurisdiction. Mo. Const. art. V, sec. 3. The judgment is affirmed.

## A. Facts

Travis Glass was convicted of murdering thirteen year old Steffini Wilkins while in the process of kidnapping her. Steffini was the daughter of Elizabeth Campbell, who owned and ran a tavern in Hannibal called "Ole Milts."[2] In March 2001, Campbell hired Glass as a bartender. During his employment, Glass went to Campbell's home, also in Hannibal, on at least three occasions. There were also occasions when Steffini would visit the bar during the day where Glass would talk to her and joke around with her. Once he called her a "hottie." Glass also spoke with Steffini on the telephone. Approximately two weeks before Steffini's murder, Campbell fired Glass.

---

1. All statutory references are to RSMo 2000 unless otherwise indicated.

2. This Court reviews the facts in the light most favorable to the verdict. *State v. Christeson*, 50 S.W.3d 251, 257 (Mo. banc 2001).

On May 24, 2001, at 8:30 p.m., Campbell left for work and took her two younger sons to the babysitter while Steffini stayed home. That evening, Steffini talked with a friend on the phone from 10:40 p.m. until 11:15 or 11:30 p.m. Meanwhile, at Ole Milts, Campbell saw Glass drinking beer. When he got up to leave, she told him to be sure to take his belongings that were behind the bar. Glass responded that he had his things and then turned to leave. Before exiting, he looked Campbell in the eye, gave her a "very snide sneer," and walked out the door.

Glass left the bar in his car, a black Oldsmobile, between 11:10 and 11:15 p.m. Around 11:30, Campbell's neighbor returned from work to his home and noticed a black Oldsmobile parked in front of Campbell's house.

Around 1:00 a.m., May 25, 2001, Michael King awoke to the sound of Glass honking his car horn and flashing his headlights into King's bedroom. King and Glass were friends, so he got dressed and went outside. When King got to the car, Glass asked King if he hated him. King got into the passenger side of the car, and they sat in King's driveway smoking cigarettes and talking for about two hours.

During this time, King noticed Glass was dirty and muddy. King also noticed a mark or injury on the palm of Glass's hand. Before Glass left, he asked King to replace a fuse in the trunk. As he was working under the hood, King found a size D "flashlight battery" next to the windshield wipers.

When Campbell came home from work around 3:00 a.m., she did not find Steffini in her room. Campbell checked the other rooms, but Steffini was not in the house. While in Steffini's room, Campbell noticed that Steffini's underwear was still inside the jeans she had been wearing when Campbell had left for work, and that one of the pant legs was inside out. Steffini did not ordinarily take her jeans off in that manner. After making several calls to friends and family, Campbell contacted the police. Sergeant Michael Lawzano of the Hannibal Police was assigned to investigate Steffini's disappearance.

During the early morning hours of May 25, 2001, a fisherman spotted a female body on the Indian Access Road at the Salt River campground in Ralls County. The nude body, later identified as the body of Steffini Wilkins, was lying face down in the grass with her head turned to the right. The fisherman contacted law enforcement, and an ambulance was called to the scene. Shortly thereafter, the coroner arrived, examined Steffini's body, and determined she was deceased.

Steffini's face appeared battered and bruised, and there was blood coming from out of her nose. Her body was covered in mud, dirt, and grass. There were muddy shoe prints in the middle of her back and along her shoulder blades. There was also a bra strap tied extremely tight around her neck that cut about a half inch into her flesh.

An autopsy revealed abrasions on Steffini's left cheek, right shoulder, lower neck, shoulder, breasts, upper and lower chest, lower abdomen, along her back, along her right left lower knee, and right lower leg. She also had multiple bruises on her face, swollen eyes, and a laceration above her right eyebrow. The linear abrasions on Steffini's back were consistent with being dragged.

The autopsy also revealed multiple hemorrhages in the head, suggesting a blunt trauma injury such as being struck by a fist or object. Steffini had six linear abrasions on the right side of her neck that corresponded with the ligature from the bra strap that was tied around her neck,

which suggested that the ligature had been moved. There were also hemorrhages in her kidney and appendix.

In addition, there was a one-inch laceration to one of the folds of skin surrounding her vagina, suggesting blunt trauma to that area through penetration. The age of the vaginal laceration was consistent with other bruises around that area and the other bruises on her body in that there was no evidence that healing had taken place.

The coroner ruled the cause of death as asphyxiation secondary to compression of the neck by a ligature. An injury of this type requires continued pressure to cause death over a period of time, with 30 to 40 seconds to lose consciousness and from two to three minutes to cause brain death.

Corporal David Hall, a criminal investigator for the Missouri Highway Patrol, examined the scene and seized hairs found on Steffini's back. Other officers found a piece of bra strap up the roadway and noted several impressions in the mud near Steffini's body. The officers also discovered several pieces of a broken flashlight in the parking lot and driveway area.

Sergeant Lawzano was also called to the scene. While Lawzano was investigating the scene at the Indian Camp Access area, his detectives were sent to Campbell's home, where they learned from Campbell's neighbor that he had seen a black Oldsmobile at Campbell's home the night before. Campbell informed the officers that Glass was the only person she knew who drove a black Oldsmobile. After checking motor vehicle records, Lawzano confirmed that a 1996 black Oldsmobile was registered to Travis Glass.

Sometime before noon on May 25, 2001, Lawzano and Trooper Scott Miller went to Glass's home where they saw a 1996 black Oldsmobile parked in the driveway. When they arrived at the house, Glass's grandparents and uncle were outside, and the officers asked to speak to Glass.

Glass came outside to speak with them, and Lawzano asked Glass if he had any information about Steffini's disappearance. Glass denied knowing anything about it, so Lawzano asked him if he had been to her house. Glass denied having been there and gave an account of his whereabouts from the night before.

Lawzano asked Glass about the clothes he had been wearing the night before, and Glass told him they were inside in the washer. Lawzano asked Glass if he would show him the clothes, which he did. Another officer later observed that there was a lot of sand on the clothes and in the bottom of the washing machine.

At 11:25 a.m., Lawzano asked for and received consent from Glass to search his car. Lawzano observed what he felt were signs of a struggle on the hood and trunk of the car. He saw "very distinct" mud smears that appeared to come from small fingers being dragged across the trunk of the car. Lawzano asked Glass how the mud got on the car, and Glass responded that he did not know. Lawzano seized hairs that were on the hood and trunk of the car. At some point that day, officers seized a pair of blue jeans from the back of the car. Also, what was later confirmed to be Steffini's blood was found on the back of the front license plate and exterior of the car.

Lawzano then asked Glass to accompany him to the Marion County Sheriff's Department to give a written statement, and Glass agreed. Neither Lawzano nor any other officer placed Glass under arrest or in handcuffs at that time. Glass and Lawzano rode to the station, which was less than a mile from Glass's home, in a cruiser driven by Corporal Holden, because Lawzano did not have a car, and

Glass's car was still in the process of being searched. On the way to the station, they stopped so Glass could go, unattended, into a convenience store to purchase cigarettes.

While at the station, Glass gave three written statements over a period of hours. The first was given to Lawzano, and was not preceded by a *Miranda* warning.[3] The second statement was given to Sergeant Michael Platte of the Missouri Highway Patrol after Glass had been given a *Miranda* warning and had signed a waiver of his *Miranda* rights. Finally, the third was given to Lawzano, who reminded him of his *Miranda* waiver prior to taking the statement. Glass was not placed under arrest prior to giving any of the statements. The circumstances and content of each statement are as follows.

*1. First written statement—to Sergeant Lawzano*

When they arrived at the station, Lawzano and Glass went over the verbal statement Glass had given earlier at his home. Glass asked Lawzano to write it out for him, after which Glass read it, agreed it was accurate, and signed it around 1:32 p.m. In this first written statement, Glass admitted he went to Ole Milts bar, that he drank between 12 and 16 cans of beer, that he played darts for quite a bit, and then left between 11:00 and 11:30 p.m. He stated that he knew Campbell owned the bar, and that he knew Steffini through his having worked at the bar.

In the statement, Glass also admitted he had been to Campbell's home a few times while he worked for her, but that the last time he had been there was three weeks prior. Glass mentioned he had e-mailed Steffini once two or three months prior to her disappearance, but that she had never responded to his e-mail. In the statement, Glass said that after he left the bar, he went to his friend Mike King's house, where he talked with him in his car for two to three hours before driving home and going to bed. Lawzano then asked Glass if it was possible that he went to the Campbell's home earlier that morning, and Glass responded that he did not remember being there, but that anything was possible because he was so intoxicated.

*2. Second written statement—to Sergeant Platte*

Sometime after noon, Sergeant Michael Platte arrived at the Marion County Sheriff's Department and was told of Glass's interview with Lawzano. Around 3:00 p.m., Platte explained Glass's *Miranda* rights to him and asked him if he understood those rights. Glass indicated he understood, signed a waiver of rights form, and agreed to talk with Platte. Initially, Glass gave Platte the same story he told Lawzano.

Platte asked Glass about Steffini, and Glass stated she was a cheerleader who liked all kinds of sports. Glass described her as "all-right looking" and again denied going to Campbell's home. At this, Platte expressed his disbelief, and then confronted Glass with several inconsistencies in his story.

Platte told Glass Steffini was still alive and was going to recover and "tell her story." Platte then "posed a possible scenario" where Glass had been at the bar and, thinking Steffini would be home alone, decided to go to her house to "get closer to her." Platte suggested maybe "things started happening" between them, but then maybe she changed her mind, and everything went to "hell in a handbasket."

---

**3.** Throughout this opinion, references are to *Miranda v. Arizona,* 384 U.S. 436, 86 S.Ct. 1602, 16 L.Ed.2d 694 (1966).

Platte said if that was the case, then Glass needed to tell his story. Glass responded "you're right."

Glass said when he left Ole Milts he decided to go see Steffini. Glass said he went to her home, knocked on the door, and a few minutes later, Steffini answered wearing nothing but blue boxers and a bra. He said he entered the house and they started kissing. Glass said she began to perform oral sex on him. Glass stated that when he tried to take it further, she started to scream that she was going to call her mom. At that point, Glass said he put his hand on her mouth to try to quiet her down but that she went limp after a few minutes and he could not find her pulse. So, Glass said he picked her up and put her in his car to go find help. He said at this point she was totally nude except for her bra, which was pulled up to reveal her breasts.

Glass stated he drove to the river access where her body was found. He said once they were there, Steffini started making wheezing noises like she was attempting to breathe. He stated that he picked her up out of his car and put her on the hood, but that in the process she fell to the ground several times. He said she made more sounds, so he set her down on the ground and left.

Glass denied penetrating her vagina with his penis or performing oral sex on her. Rather, he stated he had only licked her breasts. Glass stated that her clothing, with the exception of her bra, would all be found in the living room area.

At approximately 3:45 p.m., Platte asked Glass to write a statement containing the above information. Glass did so and drew a map of where he left her body. Corporal Hall then "informed" Platte, so that Glass could hear, that Steffini had died. Upon hearing that, Glass told Platte to get a gun because he did not deserve to live.

*3. Third written statement—to Sergeant Lawzano*

After Glass's interview with Platte, Lawzano took Glass outside to smoke some cigarettes. While they were outside, Glass said he wanted to tell Lawzano everything. Lawzano reminded Glass of his *Miranda* rights and then took Glass back into the interview room. Before re-entering the room, Lawzano served Glass with a search warrant for the car. Glass then went over the same details he had told Platte, but became emotional when Lawzano told him there were still some blanks in his story.

Glass told him when Steffini was on the trunk of his car, she was gasping for breath and was blue in the face. Glass stated he "prayed to God, 'God forgive me for what I am about to do,'" then he "wrapped her bra strap around her throat" and choked her because she was "suffering bad." He then set her on the ground and left for King's home. As before, Lawzano wrote the statement for Glass, then Glass read it, agreed it was accurate, and signed it. This interview concluded at 8:10 p.m.

Glass was then placed under arrest and examined. He had scratches on his upper right shoulder. Sexual assault kits were taken from Glass and Steffini, which included hair, saliva and blood samples, but no evidence of seminal fluid was admitted at trial. DNA material extracted from the blood found on Glass's license plate, the jeans found in the backseat of Glass's car, and a hair from Glass's trunk were consistent with Steffini's DNA profile and not Glass's. Hair comparisons were conducted, and the hairs found on Steffini's back were consistent with Glass's pubic hairs. A hair seized from the trunk of Glass's car was found to be "similar in microscopic characteristics" to Steffini's hair.

In addition, glitter particles found on Steffini's bedspread, the license plate from

Glass's car, and the jeans seized from the back of Glass's car all had the same physical characteristics, including having the same anomaly around the edges, which indicated they came from the same cutter. Steffini had many products in her bedroom that contained glitter, including gel pens, fingernail polish, and body spray.

On July 5, 2001, Corporal Hall received permission from Glass's grandfather, George Patre, to conduct a search of his home. Glass was raised by his grandparents, George and Wanetta Patre, and had lived with them in their house from infancy. The home was built such that it had doorways but no doors, except for the door to the bathroom, and there was no hallway. As a result, all of the members of the household had to walk through the various rooms in order to reach other rooms. Glass's room had three doorways, one leading to a room containing a computer area, one leading to the living room, and one leading to another bedroom. As such, all of the residents of the Patre home had joint access to Glass's room for most purposes.

Hall limited the search to Glass's room and the common computer area. In the computer area, officers seized various items, including financial documents, papers, and receipts. In Glass's room, officers also seized paperwork, note paper and financial receipts. In one of these locations, Hall found a receipt and business card with Sandra Harding's name on it. Hall subsequently interviewed Harding, and she told him about two separate occasions, approximately a month before Steffini's murder, on which Glass had walked unannounced and uninvited into Harding's home late at night. On each occasion, either Harding's daughter, Nicole Withrow, or her daughter's friend, Samantha Bramlett, were present. On one such occasion, Harding was not home, but her daughters, one fourteen and one fifteen, were. Harding told Hall she knew Glass because they had been co-workers at Dura Automotive. While they were co-workers, Glass had been to Harding's home, yet during one of the walk-in incidents, he acted confused as to whether he was in his home. At the penalty phase trial, the State introduced testimony from Withrow and Bramlett about the incidents as non-statutory aggravating factors.

### B. Standards of Review

■ The trial court is vested with broad discretion in determining the admissibility of evidence offered at the guilt and penalty phases of a capital case. *State v. Storey*, 40 S.W.3d 898, 903 (Mo. banc 2001); *State v. Middleton*, 995 S.W.2d 443, 452 (Mo. banc 1999).

■ On direct appeal, this Court reviews the trial court for prejudice, not mere error, and will reverse only if the error was so prejudicial that it deprived the defendant of a fair trial. *Storey*, 40 S.W.3d at 903 (Mo. banc 2001) (quoting *State v. Morrow*, 968 S.W.2d 100, 106 (Mo. banc 1998)). "Issues that were not preserved may be reviewed for plain error only, which requires the court to find that manifest injustice or miscarriage of justice has resulted from the trial court error." *Id.* Rule 30.20.

### C. Issues Raised on Appeal

For the sake of convenience, Glass's claims are addressed in the following order: I) the trial court erred in admitting statements made by Glass to Sergeants Lawzano and Platte (Glass's point 1); II) the trial court erred in overruling his motion to quash the information for failure to plead the statutory aggravating circumstance (Glass's point 5), and likewise erred in overruling his motion to strike the aggravating circumstance (part of Glass's

point 4); III) the trial court erred in overruling his motion for judgment of acquittal because the state failed to prove he deliberated before killing Steffini Wilkins (part of Glass's point 3); IV) the trial court erred in failing to submit an instruction to the jury on involuntary manslaughter (Glass's point 6); V) the trial court erred in admitting evidence of unadjudicated bad acts without instructing the jury as to what weight to give the evidence (Glass's point 2 and part of Glass's point 7); VI) the trial court made several errors concerning the jury instructions regarding the death eligibility findings (part of Glass's point 4 and part of Glass's point 7); VII) the trial court erred in failing to admit items of mitigating evidence during the penalty phase trial (Glass's points 8 and 9). All or parts of Glass's points 2, 4, 6, 7, and 9 were not preserved on appeal. Consequently, this Court reviews Glass's unpreserved claims in those points for plain error.

Finally, this Court conducts an independent review of the sentence pursuant to section 565.035 and addresses Glass's claim that the sentence of death in this case is disproportionate (part of Glass's point 3).

## I. The Admissibility of Glass's Statements

For his first point, Glass argues that the trial court erred in failing to suppress and admitting into evidence statements made by Glass to Sergeant Lawzano of the Hannibal Police Department and Sergeant Platte of the Missouri Highway Patrol. Glass makes three arguments. First, Glass argues the statements were the "result—the 'forbidden fruit'—of Travis' illegal detention without probable cause and no intervening events were sufficient to attenuate the taint of the illegal arrest." Second, Glass argues "the statements made to Sgt. Lawzano should have been suppressed because they were obtained by his custodial questioning of Glass without first administering *Miranda* warnings." Third, Glass argues "the statements made to Sgt. Platte should have been suppressed because he elicited them by using the unwarned statements Travis had made to Sgt. Lawzano."[4]

### a.

None of Glass's statements were "forbidden fruit," because Glass was not illegally detained prior to giving them. The police were not required to have probable cause when they interrogated Glass because he was not under arrest or arrest-like restraints. Assuming, *arguendo*, they needed probable cause to arrest Glass prior to interrogating him, there was sufficient evidence to support a finding of probable cause. Because Glass was not illegally detained, the evidence was not "tainted;" thus, no intervening event was required to attenuate the taint.

### (i)

A custodial interrogation occurs only when the suspect is formally arrested or is subjected to arrest-like restraints.

4. Glass's second and third arguments are somewhat confusing because of the way they are phrased. Though in his second argument, Glass alleges the statements (plural) given to Lawzano, should have been suppressed because they were obtained without first administering *Miranda* warnings, he can only be referring to the first written statement, which Glass gave to Lawzano without any *Miranda* warnings. The only other statement Glass gave to Lawzano was actually the third written statement, which was given after Glass had been *Mirandized* by Platte and then reminded of his *Miranda* rights again by Lawzano. Similarly, Glass's third argument alleges the statements (plural) given to Platte should be suppressed, though Glass can only be referring to the second written statement, as that was the only statement given by Glass to Platte.

*State v. Feltrop,* 803 S.W.2d 1, 13 (Mo. banc 1991). A person who voluntarily accompanies officers to the police station for questioning is not subject to arrest-like restraints. If a person is free to go at any time prior to the actual arrest, then the person is not under "arrest." *See State v. Reynolds,* 619 S.W.2d 741, 744–46 (Mo. 1981); *State v. Faulkner,* 103 S.W.3d 346, 355–57 (Mo.App.2003); *State v. Murdock,* 928 S.W.2d 374, 379–80 (Mo.App.1996); *State v. Landers,* 841 S.W.2d 791, 792 (Mo. App.1992); *State v. Brewster,* 836 S.W.2d 9, 11–12 (Mo.App.1992). The issue turns on whether the seizure is "sufficiently like arrest to invoke the traditional rule that arrests may constitutionally be made only on probable cause." *Kaupp v. Texas,* 538 U.S. 626, 630, 123 S.Ct. 1843, 155 L.Ed.2d 814 (2003). Police are simply not required to have probable cause to interrogate persons who are neither formally arrested nor "seized"—that is, persons who are not subject to arrest-like restraints.

### (ii)

▪ The evidence in this case showed that Lawzano initially engaged Glass in a voluntary discussion outside his home. Lawzano was not carrying a weapon, nor was he in uniform. Trooper Miller, who was in uniform, accompanied Lawzano and participated in searching Glass's car, but neither he nor Lawzano gave Glass reason to believe he was in police custody at that time.

Lawzano asked Glass if he would go to the sheriff's office, located less than a mile from his home, to give a written statement. Glass was not placed in handcuffs or under arrest and was free to refuse. Corporal Holden drove Lawzano and Glass to the station because Glass's car was being searched and Lawzano did not have a car with him. There is no evidence Holden's presence was to restrain, threaten or in-

timidate Glass into accompanying them to the station.

On the way to the station, Glass was allowed to go into a convenience store, unattended, to purchase cigarettes. During Glass's interview with Lawzano, he was given food and breaks. After the interview, he was allowed to go outside, without handcuffs, to smoke cigarettes. At no point during the interview did Lawzano show his weapon or physically or verbally restrain Glass in any way. This was not a situation in which the police made a "show of authority" that caused Glass to submit. A reasonable person in Glass's situation would not have felt he was not free to leave during the first interview with Lawzano.

Because Glass was not seized, detained, or placed under arrest prior to giving the first statement, the authorities did not need to show they had probable cause to arrest him prior to interviewing him. Glass mistakenly relies on *Dunaway v. New York.* 442 U.S. 200, 99 S.Ct. 2248, 60 L.Ed.2d 824 (1979). In *Dunaway,* the Supreme Court held that custodial detention for the purposes of interrogation was not allowed absent probable cause to arrest. *Id.* In that case, the police took petitioner into custody, transported him to the police station, and detained him there for interrogation. *Id.* at 206–207, 99 S.Ct. 2248. Though the officers admitted they lacked probable cause to arrest, the Court noted that the detention of petitioner was "in important respects indistinguishable from a traditional arrest." *Id.* at 212, 99 S.Ct. 2248. The Court, however, did not go so far as to say that police must have probable cause to question a person who voluntarily accompanies them to the station to answer questions. In fact, the Court specifically noted that the petitioner in that case had not gone "voluntarily" with the police to answer their questions. *Id.* at

206, 207, n. 6, 99 S.Ct. 2248. Here, because Glass went voluntarily to the sheriff's office, he was not "seized" or "detained" such that his Fourth Amendment rights were infringed as were those of the petitioner in *Dunaway.*

Further, there is no evidence that this consensual encounter turned into a seizure prior to Glass making his second statement. Again, Glass was not told he was under arrest or handcuffed prior to making the second statement, and Glass was given food and cigarette breaks. Glass was even allowed to smoke outside of the police station without handcuffs or any other type of restraint.

### (iii)

■■■■■■ Even though the police did not need probable cause to arrest Glass prior to interrogating him, the evidence was sufficient to support a finding that probable cause existed. Prior to arriving at Glass's home, the police knew the following: Steffini Wilkins was missing; the Ralls County Sheriff's Department had the deceased body of a female juvenile in its jurisdiction; Glass knew Steffini, had e-mailed her, and had once called her a "hottie;" Glass was a former employee of Steffini's mother and had been fired two weeks earlier; Steffini's neighbor had seen a black Oldsmobile at Steffini's house the night before; and a black Oldsmobile was registered to Glass. That information was sufficient to lead Lawzano to suspect a crime had occurred and that Glass may have been involved in the crime.[5]

Prior to Glass voluntarily going to the sheriff's office, the authorities knew all of the above plus, during the time they were at Glass's home, they had observed mud on Glass's car and very distinct mud smears that appeared to come from small fingers being dragged across the trunk of the car, confirmed Glass knew Steffini's address, observed that Glass's clothes from the night before were in the washer with a lot of sand, received consent to search the car and had seized hairs from the car.

■■■■■ These facts and circumstances were sufficient to cause a person of reasonable caution to believe that Glass had committed an offense. There was sufficient probable cause for the police to arrest Glass prior to getting each of the three written statements from Glass, whether he was formally arrested or not.[6]

### b.

■■■■ Glass's argument that the statements made to Lawzano should have been suppressed because they were obtained through custodial questioning without first administering *Miranda* warnings also fails. As mentioned, Glass can only be referring to the first written statement, as Glass's subsequent statement to Lawzano was made after he was given *Miranda* warnings. *Miranda* warnings are not required every time the police question an individual. In *Oregon v. Mathiason,* the Supreme Court held that "*Miranda* warnings are required only where there has been such a restriction on a person's free-

---

5. Probable cause exists where "the facts and circumstances within [the officers'] knowledge and of which they had reasonably trustworthy information [are] sufficient *in themselves* to warrant a man of reasonable caution in the belief that an offense has been or is being committed." *Brinegar v. United States,* 338 U.S. 160, 175–76, 69 S.Ct. 1302, 93 L.Ed. 1879 (1949) (emphasis in original).

6. The fact that Lawzano testified he did not believe he had probable cause to arrest Glass prior to Glass giving the first written statement is irrelevant. Probable cause is not dependent on the subjective intention of the officer. *State v. Clayton,* 995 S.W.2d 468, 477 (Mo. banc 1999).

dom as to render him 'in custody.'" 429 U.S. 492, 495, 97 S.Ct. 711, 50 L.Ed.2d 714 (1977); *accord State v. Feltrop*, 803 S.W.2d 1, 13 (Mo. banc 1991). In Missouri, "custodial interrogation" is defined as questioning initiated by law enforcement officers after a person has been taken into custody or otherwise deprived of his freedom of action in any significant way. *State v. Copeland*, 928 S.W.2d 828, 852–53 (Mo. banc.1996). "[I]n the absence of arrest or restraint of freedom of movement, questioning that takes place in a coercive environment does not require *Miranda* warnings." *Feltrop*, 803 S.W.2d at 13.

Glass's first written statement to Lawzano was admissible because, as discussed above, Glass was not taken into custody prior to making it.

### c.

■ Finally, Glass's argument that the second written statement he made, the one to Platte, should have been suppressed because it was the result of the "unwarned statements Travis had made to Sgt. Lawzano" fails as well. As mentioned previously, though Glass refers to "unwarned statements" (plural), Glass can only be referring to the first written statement Glass made, which was given to Lawzano without *Miranda* warnings. The subsequent statement given to Lawzano was made after the *Mirandized* statement made to Platte, and after he was reminded of his *Miranda* rights, and was not "unwarned." Further, the statement Glass gave to Platte could not have been the result of Glass's subsequent statement to Lawzano, because that statement was made after Glass spoke with Platte. Nonetheless, Glass's argument that the statement made to Platte should have been suppressed because it was the result of the unwarned statement made to Lawzano fails.

■ The mere failure of the police to advise a defendant of his or her *Miranda* rights prior to obtaining a statement does not, *per se*, render a subsequent statement made after a valid waiver of the defendant's *Miranda* rights inadmissible. *Oregon v. Elstad*, 470 U.S. 298, 303–309, 105 S.Ct. 1285, 84 L.Ed.2d 222 (1985). In *Elstad*, the Supreme Court held the admissibility of the subsequent statement "should turn solely on whether it [was] knowingly and voluntarily made." *Id.* Absent deliberately coercive or improper tactics in obtaining the original statement, "a subsequent administration of *Miranda* warnings to a suspect who has given a voluntary but unwarned statement ordinarily should suffice to remove the conditions that precluded admission of the earlier statements." *Id.* at 314, 105 S.Ct. 1285.

Glass relies on *State v. Seibert* as an example of improper tactics by the police. 93 S.W.3d 700, 702 (Mo. banc 2002), *aff'd*, *Missouri v. Seibert*, —— U.S. ——, 124 S.Ct. 2601, —— L.Ed.2d —— (2004). In *Seibert*, the officers who questioned appellant while she was under arrest deliberately chose to withhold giving *Miranda* warnings in the hopes of obtaining an admission of guilt. *Id.* However, the facts in this case are nothing like those in *Seibert*. Lawzano did not purposefully fail to read Glass his *Miranda* rights for fear Glass might assert them. Rather, Lawzano did not read Glass his *Miranda* rights because Glass was not under arrest nor subject to custodial questioning. Further, there is no evidence that the police deliberately chose not to place Glass under arrest so as to avoid having to read him his *Miranda* rights. Indeed, the failure of the police to formally place Glass under arrest prior to obtaining any of the statements was due to Lawzano's mistaken belief that they did not have probable cause to do so. The police did not engage in improper tactics,

and Glass's first statement was voluntarily given.

Further, though Lawzano and Platte testified that there were several "holes" in the first story that Glass had given to Lawzano, Glass did not admit involvement in Steffini's murder to Lawzano prior to speaking with Platte. The second statement in which Glass admitted, for the first time, that he assaulted Steffini was not a reiteration of the first written statement Glass gave to Lawzano, but was independent and his first statement of guilt.

The trial court did not err in admitting Glass's written statements.

## II. Statutory Aggravating Circumstance

For his fifth, and part of his fourth, points, Glass alleges several errors arising from the state's failure to plead the aggravating circumstance in the information. For clarity, this Court will address the facts and circumstances of Glass's receipt of notice of the aggravating circumstance prior to addressing his arguments.

The information in this case was filed on August 7, 2001, and did not plead the statutory aggravating circumstance the state intended to prove in order to request a sentence of death. However, on January 4, 2002, the state filed a "Notice of Intent to Seek the Death Penalty." In that document, the state announced it intended to prove the murder was committed while Glass was engaged in the perpetration of or attempt to perpetrate a felony pursuant to section 565.032.1(11). Section 565.032.1(11) lists rape, sodomy, burglary, robbery, kidnapping, or any felony offense in chapter 195 as the possible felonies that qualify as statutory aggravators.

On May 14, 2002, Glass requested that the state specify the particular felony he was allegedly committing at the time of the murder. Subsequently, Glass moved to quash the information, to strike the aggravating circumstance, or, alternatively, for a bill of particulars identifying the type and degree of felony the state was alleging. On June 7, 2002, the trial court overruled Glass's motions. On June 19, 2002, the state filed a "Notice of Evidence in Aggravation and Supplemental Disclosure Pursuant to Section 565.005, RSMo" indicating that, among other things, the state would offer evidence that Steffini Wilkins "was removed from her home to a location remote therefrom" and murdered. Glass's trial began November 18, 2002, and the penalty phase instruction conference occurred on November 21, 2002.

### a.

For his fifth point, Glass argues the trial court erred in overruling his motion to quash the information for failure to comply with *Ring v. Arizona, Apprendi v. New Jersey,* and *Jones v. United States,* and thus exceeded its authority and jurisdiction in sentencing him to death.[7] Glass argues that because statutory aggravators must be proved beyond a reasonable doubt to increase the punishment for first degree murder from life imprisonment without probation or parole to death, they are elements of the offense of "aggravated first degree murder." Glass further argues that, because the information failed to plead any aggravating circumstances, the offense actually charged was "unaggravated first degree murder," for which the only authorized sentence is life imprisonment without probation or parole.

---

**7.** *Ring v. Arizona,* 536 U.S. 584, 122 S.Ct. 2428, 153 L.Ed.2d 556 (2002), *Apprendi v. New Jersey,* 530 U.S. 466, 120 S.Ct. 2348, 147 L.Ed.2d 435 (2000), and *Jones v. United States,* 526 U.S. 227, 119 S.Ct. 1215, 143 L.Ed.2d 311 (1999).

### (i)

This Court has repeatedly held that statutory aggravating circumstances need not be pled in the information or indictment. *State v. Edwards,* 116 S.W.3d 511, 543–44 (Mo. banc 2003); *State v. Gilbert,* 103 S.W.3d 743, 747 (Mo. banc 2003); *State v. Tisius,* 92 S.W.3d 751, 766–67 (Mo. banc 2002); *State v. Cole,* 71 S.W.3d 163, 171 (Mo. banc 2002). Pursuant to section 565.005.1, the state is required to give notice to the defendant "[a]t a reasonable time before the commencement of the first stage of [a capital trial]," of the statutory aggravating circumstances it intends to submit in the event the defendant is convicted of first degree murder. Notice of statutory aggravating circumstances stands in lieu of charging them in the information or indictment. *Edwards,* 116 S.W.3d at 543.

Only the Sixth Amendment requirement that an accused "be informed of the nature and cause of the accusation" has been applied to the states through the Fourteenth Amendment. *Blair v. Armontrout,* 916 F.2d 1310, 1329 (8th Cir.1990). "[T]he states are not bound by the technical rules governing federal criminal prosecutions under the Fifth Amendment." *Id.* Even legally insufficient charging documents have been held not to violate the Sixth Amendment when the defendant received actual notice of the charge against him. *Hartman v. Lee,* 283 F.3d 190, 195, n. 4 (4th Cir.2002).

### (ii)

Glass's assertion that this Court's holding violates *Ring, Apprendi,* and *Jones,* is without merit in that those cases held that aggravating factors operate as "the functional equivalent of an element of a greater offense" insofar as the Sixth Amendment requires that they be found by a jury, but made no holding as to whether they must be included in the indictment. *Ring,* 536 U.S. at 609, 122 S.Ct. 2428; *Apprendi,* 530 U.S. at 477, n. 3, 120 S.Ct. 2348. In *Jones,* the statute at issue was a federal car-jacking statute, and, as mentioned, the requirements of the Fifth Amendment indictment clause do not apply to the states. 526 U.S. at 229, 119 S.Ct. 1215.

The trial court did not err in overruling his motion to quash the information.

### b.

For the same reasons, part of Glass's fourth point, that the trial court erred in overruling his motion to strike the state's aggravating circumstance or, alternatively, in failing to require the state to provide a bill of particulars as to which felony the state was alleging, fails.

As discussed above, Glass was initially notified that kidnapping was one of the possible felonies the state would prove as a statutory aggravator eleven months before his trial. Any vagueness was rectified by the state on June 19, 2002, when it filed its notice of evidence in aggravation. At that point, five months prior to the start of trial, Glass had sufficient notice that the state would allege he murdered Steffini Wilkins while in the process of kidnapping or attempting to kidnap her.

The trial court did not err in overruling Glass's motion to strike the aggravating circumstance and his motion to require the state to provide a bill of particulars.

### III. Deliberation

For part of his third point, Glass argues the trial court erred in overruling his motion for judgment of acquittal at the close of all of the evidence because the state failed to prove Glass "coolly" reflected on

killing Steffini Wilkins.[8] This argument is wholly without merit.

### (a)

Section 565.020.1, which defines murder in the first degree, requires proof of deliberation. This requirement "sets first degree murder apart from all other forms of homicide." *State v. O'Brien*, 857 S.W.2d 212, 217–18 (Mo. banc 1993). Absent evidence of deliberation, an intentional killing is second degree murder. *State v. Snow*, 293 Mo. 143, 238 S.W. 1069 (1922). *See also* section 565.021.1. "Deliberation" is defined as "cool reflection for any length of time no matter how brief." Section 565.002(3). Deliberation must ordinarily be provided through the circumstances surrounding the crime. *State v. Ferguson*, 20 S.W.3d 485, 497 (Mo. banc 2000). Deliberation may be inferred, but must still be proved beyond a reasonable doubt. *State v. Malady*, 669 S.W.2d 52, 55 (Mo.App.1984).

"Proof of deliberation does not require proof that the defendant contemplated his actions over a long period of time, only that the killer had ample opportunity to terminate the attack once it began." *State v. Johnston*, 957 S.W.2d 734, 747 (Mo. banc 1997) (internal citations omitted). "Where a defendant commits a murder which, because of the particular method of attack, required some time to complete, this Court has permitted an inference of deliberation." *Id.See also State v. Sturdivan*, 497 S.W.2d 139, 142 (Mo. banc 1973), *overruled on other grounds by State v. Anderson*, 515 S.W.2d 534 (Mo. banc 1974) (jury reasonably inferred premeditation when the defendant strangled the victim with his bare hands and then

subsequently applied a towel for two or three minutes longer to make sure he was dead).

Deliberation may also be inferred when there are multiple wounds or repeated blows. *Johnston*, 957 S.W.2d at 748; *see e.g. Ferguson*, 20 S.W.3d at 493; *State v. Parkus*, 753 S.W.2d 881, 884 (Mo. banc 1988); *Sturdivan*, 497 S.W.2d at 142. In addition, failure to seek medical help for a victim strengthens the inference that the defendant deliberated. *State v. Feltrop*, 803 S.W.2d 1, 12 (Mo. banc 1991).

### (b)

The evidence to support the jury's finding of deliberation was substantial. First, Glass had many opportunities to terminate the attack once it began. Glass was with Steffini for at least an hour, during which he assaulted her, kidnapped her and took her to another location, dropped her several times on the trunk and hood of his car, and then strangled her to death. At any point, Glass could have ceased attacking her or sought medical attention, which he did not. Glass's own testimony was that, after he put his hand over her mouth to the point where she went limp and he could not find her pulse, he took her to the river access and choked her with her bra strap instead of seeking help.

Second, the evidence that Steffini suffered multiple wounds and the nature of her death—asphyxiation after a struggle absent evidence of any provocation by the victim—strengthens the jury's inference that Glass deliberated. The medical testimony in this case was that it took from two to three minutes for Steffini to die in this way. Finally, Glass's own account, that he "prayed to God, 'God, forgive me for what

---

8. As part of this argument, Glass argues the sentence of death he received was disproportionately harsh to the crime he committed. Glass is apparently invoking his right to a proportionality review as required by section 565.035.3. This argument is addressed below in section VIII.

I am about too [sic] do'" before choking Steffini with her bra strap to end the suffering he had previously imposed on her, shows he deliberated.

The trial court did not err in overruling Glass's motion for judgment of acquittal.

### IV. Instruction on Involuntary Manslaughter

■ For his sixth point, Glass argues the trial court erred in failing to instruct the jury on involuntary manslaughter. Glass argues his statement to Platte that he put his hands over Steffini's mouth to keep her quiet, and his subsequent statement to Lawzano that he choked Steffini with her bra strap to end her suffering, were evidence from which a jury could find or infer an "intentional act" with "a conscious disregard of a risk of death to another" that manifested "a gross deviation from what a reasonable person would do in the circumstances." Glass argues this evidence provided both a basis to acquit him of first and second degree murder and to convict him of involuntary manslaughter.

■ At trial, the jury was instructed on first and second degree murder. At the guilt phase instruction conference, Glass proffered a modified involuntary manslaughter instruction, MAI–CR3d 313.10. This instruction submitted that Glass had "recklessly" caused Steffini's death by strangling her. To this extent, the issue is preserved.

■ Glass made no request at trial, however, for an instruction that included death by suffocation. As a result, his objection to the trial court's failure to give an instruction of involuntary manslaughter based on death by suffocation is not preserved.[9]

When a jury is "presented with instructions on murder in the first degree and murder in the second degree, [and] had the opportunity to find that [the defendant's] actions were not deliberate" but nonetheless convicts of first degree murder, "no reasonable basis exists to suggest that the jury would have reduced the conviction had they been presented with" a different lesser included offense instruction. *State v. Jones*, 979 S.W.2d 171, 185 (Mo. banc 1998). That is, when a jury is given an instruction on a lesser offense but finds the defendant guilty of first degree murder, there is no error in failing to give a different lesser offense instruction because the jury has already been given an opportunity to reject the element of deliberation and did not do so. *See State v. Wise*, 879 S.W.2d 494, 517 (Mo. banc 1994) (no prejudice in failing to give a felony second degree murder instruction because "second degree conventional murder instruction sufficiently tested the jury's belief of the elements of first degree murder"); *State v. Stepter*, 794 S.W.2d 649, 652 (Mo. banc 1990) (second degree murder tests a jury's belief of the crucial facts for a conviction of first degree murder); *State v. Frost*, 49 S.W.3d 212, 218–19 (Mo. App.2001).

The trial judge did not err, plainly or otherwise, in refusing to submit an instruction on involuntary manslaughter, whether based on death by strangulation or suffocation.

### V. Penalty Phase Evidence of Unadjudicated Bad Acts

#### a.

■ For his second point, Glass argues the trial court erred in admitting evidence

---

**9.** This Court reviews this point for plain error. Rule 30.20. "Instructional error constitutes plain error when it is clear the trial court so misdirected or failed to instruct the jury so

that it is apparent the error affected the verdict." *State v. Beeler*, 12 S.W.3d 294, 300 (Mo. banc 2000).

during the penalty phase that on two separate occasions Glass walked, uninvited, into residences occupied by teenage girls. Glass argues the evidence was inadmissible "fruit of the poisonous tree" in that the state learned of it through an improperly seized receipt taken from Glass's room without his consent or, alternatively, that the state failed to show that the receipt had been seized from a location other than Glass's room. Although at the start of the penalty phase trial Glass raised a motion to suppress the witnesses' testimony as fruit of the poisonous tree, once the motion was overruled, Glass failed to object to the testimony until after it was admitted. Glass's claim, therefore, is unpreserved and is entitled only to plain error review. Rule 30.20.

#### (i)

■ Evidence need not be excluded when "voluntary consent has been obtained, either from the individual whose property is searched ... or from a third party who possesses common authority over the premises." *Illinois v. Rodriguez,* 497 U.S. 177, 181, 110 S.Ct. 2793, 111 L.Ed.2d 148 (1990) (citations omitted). "Common authority" exists when there is a "mutual use of the property by persons generally having joint access or control for most purposes." *United States v. Matlock,* 415 U.S. 164, 171, n. 7, 94 S.Ct. 988, 39 L.Ed.2d 242 (1974); *accord State v. Johns,* 679 S.W.2d 253, 262 (Mo. banc 1984). In this state, "It appears that it takes unusual circumstances for a child living with a parent to claim that the parent does not have permission to consent to a search of the child's sleeping area even if the child is an adult." *State v. Cole,* 706 S.W.2d 917, 919 (Mo.App.1986); *Johns,* 679 S.W.2d at 262; *State v. Pruitt,* 479 S.W.2d 785, 788 (Mo. banc 1972); *cf. State v. Peterson,* 525 S.W.2d 599, 608 (Mo.App. 1975) (evidence showed that the basement bedroom was "exclusively" the son's area and "no one else had a right to be there"); and *State v. Pinegar,* 583 S.W.2d 217, 219 (Mo.App.1979) (evidence showed that the family understood a footlocker in the adult son's bedroom was his private personal footlocker). Where evidence would have ultimately or inevitably been discovered by lawful means and, therefore, would have been admitted regardless of any overreaching by the police, it should be admitted. *Nix v. Williams,* 467 U.S. 431, 443, 104 S.Ct. 2501, 81 L.Ed.2d 377 (1984); *accord State v. Butler,* 676 S.W.2d 809, 812 (Mo. banc 1984).

#### (ii)

■ Corporal Hall testified that he received permission from George Patre, Glass's grandfather and the owner of the home, to conduct the searches of Glass's bedroom and the computer area in the home. There are several reasons why Patre's consent was sufficient to authorize the searches of those areas. Because Glass's grandfather had raised Glass in that home from infancy, Patre stands in the place of Glass's parent and therefore had the authority to consent to a search of Glass's room. Further, because the house had no doors and all of the inhabitants of the house traversed through Glass's room and the computer area to get around the house, all of the residents, including Patre, had common authority over the computer area and Glass's bedroom. Finally, because of the layout of the house, Glass could not have had a reasonable expectation of privacy for items left in the open. Because Hall received voluntary consent from Patre to search the areas at issue, the trial court did not err, plainly or otherwise, in admitting evidence recovered in those searches.

■ The testimony concerning the walk-ins also was admissible because Hall

would have discovered this evidence even without the receipts. While the receipts led the police to Harding, who then directed them to Bramlett and Withrow who testified about the walk-ins, the police would have found Harding anyway. Harding used to work with Glass at Dura Automotive, and Hall testified he had begun contacting prior employers to find people who knew Glass as a part of his "character background."

Because Hall received valid consent to search Glass's room and because the evidence would have been discovered through other lawful means, Glass did not suffer manifest injustice by the admission of the testimony about the walk-ins.

### b.

For part of his seventh point, Glass argues the trial court erred in admitting evidence of the walk-ins because Glass was never charged or tried for that conduct. Glass's argument here is twofold. First, Glass argues the evidence was inherently unreliable and prejudicial because no jury had ever found beyond a reasonable doubt that these incidents actually occurred. Second, Glass argues that, even if the evidence was admissible, the penalty phase jury should have been instructed as to what weight to give the evidence, as it was significantly less reliable than evidence related to prior convictions. Glass argues that the risk that the jurors would apply a standard of proof "lesser" than the constitutionally required "beyond a reasonable doubt" standard to the evidence not only violates statutory standards, it also violates the Sixth, Eighth, and Fourteenth Amendments to the United States Constitution. For this proposition, Glass relies heavily on this Court's decision in *State v. Debler*, 856 S.W.2d 641 (Mo. banc 1993).

Because defense counsel did not object at the time the two women testified about the walk-ins, this claim is not preserved and is only entitled to plain error review. Rule 30.20.

■ This Court has repeatedly rejected the claim that the admission in the penalty phase of unadjudicated bad acts violates due process because the state is not required to prove those acts beyond a reasonable doubt. *See State v. Ferguson*, 20 S.W.3d 485, 500 (Mo. banc 2000); *State v. Kinder*, 942 S.W.2d 313, 331 (Mo. banc 1996). "The trial court has discretion during the punishment phase of trial to admit whatever evidence it deems helpful to the jury in assessing punishment." *State v. Six*, 805 S.W.2d 159, 166 (Mo.1991).

Glass's reliance on *Debler* is misplaced. This Court has consistently noted that the error in *Debler* was lack of notice. There is no merit to the claim that *Debler* required the jury to be instructed on what weight to give evidence of unadjudicated criminal acts. *State v. Christeson*, 50 S.W.3d 251, 269–70 (Mo. banc 2001); *State v. Ervin*, 979 S.W.2d 149, 158 (Mo. banc 1998).

■ Glass's argument that the unadjudicated conduct involved here is more prejudicial because it is more closely related to the charged crime is also unpersuasive. In *Debler*, the defendant was convicted of murder in the first degree, and the prior unadjudicated conduct was the defendant's uncharged, unconvicted drug dealing. 856 S.W.2d at 657. The evidence in *Debler* was particularly prejudicial because of the seriousness of the conduct and the extensiveness of the evidence. *Id.* In contrast, the evidence of the walk-ins in this case was not extensive. In addition, any prejudicial effect the walk-in evidence may have had pales in comparison to Glass's own admission of his brutal strangulation of Steffini Wilkins.

Glass did not suffer manifest injustice from the admission of the evidence of the walk-ins at the penalty phase trial.

## VI. Mitigating Evidence

### a.

For his eighth point, Glass argues that during the penalty phase, the trial court erred in denying Exhibit 42, a poem he wrote, and Exhibit 46, a family tree he made while incarcerated. Glass argues the exclusion of this mitigating evidence was reversible error under *Skipper v. South Carolina*, 476 U.S. 1, 106 S.Ct. 1669, 90 L.Ed.2d 1, (1986). Glass argues that, because the poem was written after he was incarcerated, it is evidence of his peaceful adjustment to life in prison. He argues it would have also provided the jury with evidence that his life is useful in that he is contributing to society through his poetry. Glass makes the same argument as to the family tree, adding also that it shows his love for his family. Glass further argues that both pieces of evidence were relevant to the jury's determination of whether life imprisonment or death was an appropriate sentence in his case.

### (i)

In *Skipper*, the Supreme Court held the trial court's exclusion of the testimony of two jailers and one "regular visitor" to the jail that purported to show the defendant had "made a good adjustment" during his time spent in jail denied the defendant his right to place before the sentencing jury all relevant evidence in mitigation of punishment. 476 U.S. at 1, 106 S.Ct. 1669. The Court noted that a sentencer should not be precluded from considering, as a mitigating factor, any aspect of a defendant's character or record and any of the circumstances of the offense that the defendant proffers as a basis for a sentence less than death. *Id.* at 4, 106 S.Ct. 1669

(internal citations omitted). Specifically, the Court noted:

> Evidence that the defendant would not pose a danger if spared (but incarcerated) must be considered potentially mitigating ....[because] ... a defendant's disposition to make a well-behaved and peaceful adjustment to life in prison is itself an aspect of his character that is by its nature relevant to the sentencing determination.

*Id.* at 5–6, 106 S.Ct. 1669.

However, the trial court retains broad discretion in determining whether evidence offered during the penalty phase of a capital case is admitted. *State v. Nicklasson*, 967 S.W.2d 596, 619 (Mo. banc 1998). To that end, it is not an abuse of discretion for the trial court to limit cumulative mitigation evidence. *Id.*

### (ii)

Glass presented ten witnesses during the penalty phase trial to testify about his family life and ancestry, as well as his musical and artistic talents. For example, Glass's sister testified about his saxophone playing as well as his drawing. A picture Glass drew while he was in prison for his niece's birthday was also admitted into evidence.

Glass's other sister testified that "even after Travis got arrested he sent us letters [and] he'd always have a little picture drawn on the bottom or on the back of the envelope." She also testified that Glass often wrote poetry and had even written a song for her wedding. The song Glass wrote, "It's Called Love," was read aloud to the jury and admitted into evidence.

Glass's mother, uncle, aunt and cousin testified that they loved Glass, missed him, and that they would continue to maintain contact with him if he were to receive a sentence of life in prison. Glass's cousin

also testified that Glass had sent him pictures and letters from prison.

Though the poem to which Glass refers was not admitted into evidence at the penalty phase, another of his poems was admitted as well as a certificate Glass won for writing the poem at issue.

Because of all of the testimony given by Glass's family, as well as the fact that other drawings made and another poem written by Glass in prison were admitted into evidence, this Court finds the trial court did not abuse its discretion in excluding these two items of mitigating evidence because they were cumulative of other admitted evidence.

In addition, Glass has failed to show how he was prejudiced by the exclusion of the family tree and poem. Glass has not shown why either of these two items of evidence would have provided the sentencing jury with any additional insight or assistance in deciding whether to impose a sentence of death. The trial court did not err in excluding the family tree and poem.

### b.

■ For his ninth point, Glass argues the trial court erred in failing to admit a letter from his grandmother that she prepared because she was too ill to attend trial. Glass argues this letter is mitigating evidence that should have been admitted pursuant to *Brown v. Luebbers*, 344 F.3d 770 (8th Cir.2003).

■ At the penalty phase trial, the State objected to the letter, stating it was irrelevant hearsay. Glass failed to make an offer of proof as to why the letter should have been admitted. As a result, review is for plain error. Rule 30.20.

Glass argues the rules of evidence regarding hearsay should not be applied mechanically when doing so would preclude the defendant from introducing highly relevant evidence at the penalty phase trial. *Green v. Georgia*, 442 U.S. 95, 97, 99 S.Ct. 2150, 60 L.Ed.2d 738 (1979) (citations omitted). Glass argues there is no reason to doubt the reliability of the letter and notes that the State never challenged the authenticity of the letter. Glass further argues the letter is highly relevant to the jury's determination of whether he should live or die.

Regardless of the veracity of the letter, it is cumulative evidence that his family loves him. In the letter, Glass's grandmother stated that she and her husband raised Glass from infancy; that she loved and missed Glass; that Glass's grandfather had suffered a stroke; and that Glass was a smart well-behaved boy who played saxophone, was in a band in high school, and that he liked to watch sports on television. All of this information was covered at trial by other witnesses.

Glass nonetheless directs this Court to *Brown v. Luebbers*, where the Eight Circuit held that a letter written by the defendant's brother while he was serving active duty in the army in the Persian Gulf should have been admitted as mitigating evidence at the defendant's penalty phase trial. 344 F.3d at 786–87. This case was vacated and the matter was reargued before the court en banc. Upon reargument, the court agreed with this Court's holding that the exclusion of the letter was harmless beyond a reasonable doubt. *Brown v. Luebbers*, 371 F.3d 458, (8th Cir.2004). Glass has failed to show he suffered manifest injustice when the penalty phase court excluded his grandmother's letter from evidence.

### VII. Instructions on Death Eligibility Findings

#### a.

■ For part of his fourth point, Glass argues that the trial court erred in giving

Instruction 17, which required the jury to find the statutory aggravating factor beyond a reasonable doubt, because it was a fatal variation from the information in that it submitted an offense not charged because no statutory aggravators were pled in the information. This finding is the first of four steps in the process required by the section 565.030.4 for determining whether a defendant is eligible for the death penalty.

■ At no point did Glass object to Instruction 17 on the fatal variance ground raised in this appeal.[10] This Court reviews that claim for plain error. Rule 30.20.

### (i)

■ "Instructions which are at variance with the charge or which are broader in scope than the evidence are improper unless it is shown that an accused is not prejudiced thereby." *State v. Daugherty*, 631 S.W.2d 637, 639–40 (Mo.1982). A variance is not fatal, and will not require reversal, unless it submits "a new and distinct offense from that with which defendant was charged." *State v. Clark*, 782 S.W.2d 105, 108 (Mo.App.1989). A variance must be material, and defendant must be prejudiced, to warrant reversal. *Id.* "Variances are material when they affect whether the accused received adequate notice; variances are prejudicial when they affect the defendant's ability to defend against the charges." *State v. Whitfield*, 939 S.W.2d 361, 366 (Mo. banc 1997).

### (ii)

■ Glass's argument that Instruction 17 constituted a "fatal variance" from the

charging document is without merit. Ordinarily, issues involving variances arise during the jury's determination of the defendant's guilt or innocence and involve differences between the charging document and the verdict directing instruction(s). *State v. Madison*, 997 S.W.2d 16, 19 (Mo. banc 1999). However, as addressed above, the state is not required to plead statutory aggravators in the indictment, but rather must give a defendant notice of them within a reasonable amount of time before trial. A variance in this situation would only occur when there are differences between the statutory aggravators of which the defendant was given notice and the verdict directing instructions. Here, Instruction 17, addressing whether Glass committed the murder while in the process of kidnapping Steffini, did not vary from what the state notified Glass it was going to prove.

Because the state was not required to plead the statutory aggravator in the indictment, and because Glass received adequate notice of the statutory aggravator within a reasonable time before trial, he did not suffer manifest injustice from the trial court giving Instruction 17.

### b.

■ For part of his seventh point, Glass argues the trial court erred in submitting Instructions 18 and 19 without instructing the jury that the findings must be made beyond a reasonable doubt.

■ The instructions at issue involved the second two of four steps in the section 565.030.4 process for determining whether

---

10. In his brief, Glass also requests that this Court review for plain error the argument that the "terrorize" element of kidnapping could apply to any murder and is unconstitutionally vague. However, Glass neither raised this objection at trial nor provided any legal support for this allegation in his brief. As a result, the objection was waived, and this Court will not review it for error, plain or otherwise. *State v. Storey*, 40 S.W.3d 898, 905 (Mo. banc 2001); *see also* Rule 84.04(d).

a defendant is eligible for the death penalty. Instruction 18 addressed section 565.030.4(2) and required the jury to find whether there were facts or circumstances in aggravation of punishment that warranted the imposition of the death penalty. Instruction 19 addressed section 565.030.4(3), which required the jury to determine whether there were facts or circumstances in mitigation of punishment that were sufficient to outweigh the facts or circumstances in aggravation.

Because Glass did not object to Instructions 18 and 19 at the time they were offered, this claim is unpreserved. This Court reviews for plain error. Rule 30.20.

As to Instructions 18 and 19, Glass's argument that the jury had to make the findings in these instructions beyond a reasonable doubt is without merit. Glass relies heavily on *State v. Whitfield* to make his argument that all four of the death-eligibility findings must be made by a jury beyond a reasonable doubt. 107 S.W.3d 253 (Mo. banc 2003). Glass's reliance on *Whitfield* is misplaced. Nothing in *Whitfield* or in section 565.030.4 requires the jury to make the findings in steps 2 and 3 beyond a reasonable doubt. In *Whitfield,* this Court determined that the factual determinations required in the first three steps, set out in subsections 565.030.4(1), (2) and (3), must be made by a jury, not a judge. 107 S.W.3d at 258–61. While subsection 565.030.4(1) expressly requires that a jury find any statutory aggravating circumstances beyond a reasonable doubt, the other subsections do not.

Glass did not suffer manifest injustice by the giving of Instructions 18 and 19.

## VIII. Proportionality Review

■ Pursuant to section 565.035.3, this Court is required to determine:

(1) Whether the sentence of death was imposed under the influence of passion, prejudice, or any other arbitrary factor; and

(2) Whether the evidence supports the jury's or judge's finding of a statutory aggravating circumstance as enumerated in subsection 2 of section 565.032 and any other circumstance found;

(3) Whether the sentence of death is excessive or disproportionate to the penalty imposed in similar cases, considering both the crime, the strength of the evidence, and the defendant.

Having thoroughly reviewed the record, this Court concludes that there is no evidence to suggest that the punishment imposed was a product of passion, prejudice, or any other arbitrary factor.

The trial court's findings are next reviewed to determine if the evidence supports, beyond a reasonable doubt, the existence of an aggravating circumstance and any other circumstance found. In this case, the jury unanimously found one statutory aggravating circumstance as a basis for considering the death sentence. The evidence supports, beyond a reasonable doubt, a finding that Glass committed the murder while in the process of kidnapping Steffini Wilkins.

Finally, this Court has upheld sentences of death in similar cases where the defendant abducted a young victim, sexually abused and then murdered the victim, and discarded the victim's body in a careless manner. *State v. Ferguson,* 20 S.W.3d 485, 497 (Mo. banc 2000); *State v. Brooks,* 960 S.W.2d 479, 502 (Mo. banc 1997); *State v. Nunley,* 923 S.W.2d 911, 926 (Mo. banc 1996); *State v. Brown,* 902 S.W.2d 278, 300–301 (Mo. banc 1995); *State v. Gray,* 887 S.W.2d 369 (Mo. banc 1994); and *State v. Lingar,* 726 S.W.2d 728, 741–42 (Mo. banc 1987). The death sentence in this

case is neither excessive nor disproportionate to the penalty imposed.[11]

The judgment is affirmed.

All concur.

---

11. This analysis also disposes of the second part of Glass's third point where he argues the errors he alleges combined with the mitigating evidence in this case undermine "the reliability of the verdict of death."