**F I L E D**
**United States Court of Appeals**
**Tenth Circuit**

**May 15, 2006**

**Elisabeth A. Shumaker**
**Clerk of Court**

PUBLISH

**UNITED STATES COURT OF APPEALS**

**TENTH CIRCUIT**

UNITED STATES OF AMERICA,

Plaintiff-Appellee,

v.                                                    No. 05-6088

DONNIE K. ALEXANDER,

Defendant-Appellant.

**APPEAL FROM THE UNITED STATES DISTRICT COURT**
**FOR THE WESTERN DISTRICT OF OKLAHOMA**
**(D.C. NO. CR-04-161-T)**

William P. Earley, Assistant Federal Public Defender, Oklahoma City, Oklahoma, for Defendant-Appellant.

Randal A. Sengel, Assistant United States Attorney, Oklahoma City, Oklahoma, for Plaintiff-Appellee.

Before **TYMKOVICH, HOLLOWAY**, and **EBEL**, Circuit Judges.

**TYMKOVICH**, Circuit Judge.

While serving time as a federal prisoner in Oklahoma, Donnie K. Alexander helped his friend, Lonnie Sawyer, assault a fellow inmate. Alexander invoked his Fifth Amendment right to remain silent when first questioned about his role in the

fight. Prison officials ceased questioning. However, they later placed Alexander in a cell next to Sawyer, after Sawyer requested an opportunity to convince Alexander that he should discuss his participation in the attack with prison authorities. Following the friends' conversation, Alexander admitted to officials his role in planning and carrying out the assault.

A jury in the Western District of Oklahoma found Alexander guilty of assault resulting in serious bodily injury in violation of 18 U.S.C. § 113(a)(6). Alexander asks us to reverse his conviction for three reasons: (1) the district court should have suppressed the statements he made to the FBI after Sawyer convinced him to confess his role in the assault; (2) the district court constructively amended the grand jury indictment by instructing the jury on aiding and abetting; and (3) the government did not present sufficient evidence for the jury to conclude that the victim suffered serious bodily injury.

We have jurisdiction pursuant to 28 U.S.C. § 1291. Finding no legal error, we AFFIRM.

## I. Background

Donnie K. Alexander and Lonnie Sawyer, friends and inmates at the Federal Correctional Institute in El Reno, Oklahoma (El Reno), planned an attack on Curt Howell, another inmate at El Reno. Sawyer, who admitted to initiating

the assault, persuaded Alexander to participate after describing to him the persistent abuse he had suffered at the hands of Howell.

Sawyer and Alexander carried out their plan one evening. Waiting until Howell was returning alone from a shower, Sawyer repeatedly struck Howell with a belt to which he attached two padlocks. Although Howell attempted to avoid the assault, Alexander ran alongside him, both to restrain him and ensure that no other inmates could assist. Alexander never actually beat Howell with the belt; however, he actively engaged in the assault in several ways — (1) punching Howell as he ran alongside him, (2) tackling Howell to the ground, (3) punching Howell as he lay on the ground, and (4) kicking Howell in the head with his steel-toed work boots.

Prison officers identified both Sawyer and Alexander during the assault. In a subsequent investigation by the FBI, the FBI questioned Alexander first. However, he answered no questions, invoked his Fifth Amendment right to remain silent, and was returned to his cell. Alexander never invoked his right to counsel.

The FBI next questioned Sawyer, who waived his *Miranda* rights and confessed. After implicating Alexander in the assault, Sawyer expressed concern to his FBI interrogators for Alexander. He worried that Alexander's refusal to cooperate might adversely affect Alexander's possibility of receiving a reduced sentence. He emphasized that Alexander refused only because "prison code"

forbade him from speaking with the authorities until after Sawyer's confession. Sawyer, therefore, requested to speak with Alexander to convince him to give a statement. The FBI acquiesced and placed the two men in adjoining cells that night; however, they told Sawyer that they would not resume any questioning of Alexander unless Alexander volunteered.

In their cells, Alexander and Sawyer discussed their plight. The conversation focused on Sawyer's concern with being labeled a "snitch," based on his confession to authorities which detailed Alexander's role in the attack. Worried that inmates might harass Sawyer as a consequence of this confession, Alexander agreed to contact the FBI and give them a statement. The FBI returned the following morning. Alexander was again read his *Miranda* rights; this time, however, he waived his rights, signed an "Advice of Rights" form, and proceeded to make a statement in which he admitted to his participation as a lookout, his attempt to contain Howell during the attack, tackling Howell, and kicking Howell as he lay on the ground. These statements were introduced at trial.

## II. Proceedings Below

Alexander filed a pretrial motion to suppress the statement he gave to the FBI claiming it resulted from an unlawful interrogation. The district court denied the motion, finding that Sawyer was not acting as an agent of the government when he persuaded Alexander to confess, or, alternatively, that Sawyer's

discussion with Alexander did not constitute unlawful police interrogation. At the close of the government's case and after the defense rested, Alexander moved for a judgment of acquittal based on the government's failure to charge him with aiding and abetting in the indictment. He also moved for acquittal based on insufficient evidence to show serious bodily injury. The district court denied both motions.

### III. Analysis

Alexander raises three issues on appeal. First, he argues that the district court erred in denying his pre-trial motion to suppress the statement he gave to the FBI. Second, he claims the government's failure to indict him on aiding and abetting, the charge on which he was ultimately convicted, violated his due process rights. Finally, he argues the evidence submitted to the jury was insufficient to show Howell suffered serious bodily injury as defined by 18 U.S.C. § 1365.

### A. Self-Incrimination

The Fifth Amendment requires the government to cease questioning a suspect if he invokes his right to remain silent and permits the government to reopen questioning only if the suspect consents. *Michigan v. Mosley*, 423 U.S. 96, 104 (1975); *United States v. Glover*, 104 F.3d 1570, 1581 (10th Cir. 1997). Alexander argues the FBI violated this fundamental principle by improperly

reinitiating questioning through Sawyer's intervention. The government urges that, to the contrary, because Sawyer's persuasion did not constitute unlawful governmental interrogation, Alexander voluntarily chose to reinitiate questioning with the FBI.

When reviewing a district court's denial of a motion to suppress, we view the evidence in the light most favorable to the prevailing party and accept the court's factual findings unless clearly erroneous. *United States v. Johnson*, 364 F.3d 1185, 1188 (10th Cir. 2004). A finding is clearly erroneous only if no factual support can be found in the record or if it is obvious to this court that an error has occurred. *Glover*, 104 F.3d at 1579. "The credibility of witnesses, the weight to be given evidence, and the reasonable inferences drawn from the evidence fall within the province of the district court." *United States v. Long*, 176 F.3d 1304, 1307 (10th Cir. 1999).

The seminal case of *Miranda v. Arizona*, 384 U.S. 436 (1966), stands for the well-known proposition that a suspect in custody has a constitutional right under the Fifth Amendment to remain silent. *See* U.S. Const. amend. V ("No person . . . shall be compelled in any criminal case to be a witness against himself . . . ."). If a suspect invokes this right, then the admissibility of any further statements by the suspect depends "on whether his right to cut off questioning was scrupulously honored." *Mosley*, 423 U.S. at 104 (quotation marks omitted).

If an individual expresses his desire to remain silent, all interrogation must cease.

*Id.* at 100. In limited circumstances, though, police may reinitiate questioning, but only if four conditions are met:

> (1) at the time the defendant invoked his right to remain silent, the questioning ceased; (2) a substantial interval passed before the second interrogation; (3) the defendant was given a fresh set of *Miranda* warnings; and (4) the subject of the second interrogation [is] unrelated to the first.

*Id.* at 104–05.

This four-part test is inapplicable, however, if the suspect, and not the police, reinitiates contact and agrees to questioning. *Glover*, 104 F.3d at 1581. In *Glover*, we confronted the admissibility of a defendant's confession "where the individual in custody, rather than the police, initiate[d] further discussion." *Id.* We held that in such a circumstance a defendant's right to remain silent is not violated.

> [A] person in custody, "having expressed his desire to deal with the police only through counsel, is not subject to further interrogation by the authorities until counsel has been made available to him, *unless the accused himself initiates further communication* . . . . According to the [Supreme] Court, nothing in the Fifth and Fourteenth Amendments would prohibit the police from merely listening to [an arrestee's] voluntary, volunteered statements and using them against him at trial."

*Id.* (emphasis in original) (quoting *Edwards v. Arizona*, 451 U.S. 477, 484–85 (1981)). Simply stated, a defendant—even if he has asserted the right to

counsel—may choose to reinitiate contact with the police so long as the government does not coerce him into doing so.

With these principles in mind, we turn to Alexander's argument that Sawyer—acting on behalf of the government—persuaded Alexander to confess, and in doing so effectively overcame his will through unconstitutional governmental coercion.

1.

An agent of the government, like the government itself, is restrained by the language of the Constitution. Private parties are not. *See Colorado v. Connelly*, 479 U.S. 157, 166 (1986) (noting that even the "most outrageous behavior by a private party seeking to secure evidence against a defendant does not make that evidence inadmissible under the Due Process Clause"). Here, relying on our search and seizure precedent under the Fourth Amendment, the district court found as a factual matter that Sawyer's conduct did not constitute government action.

In *United States v. Souza*, 223 F.3d 1197 (10th Cir. 2000), we identified a two-pronged approach to determine whether a search by a private person should be classified as a government search. We first consider "whether the government knew of and acquiesced in the intrusive conduct . . . ." *Id.* at 1201 (citation and quotation omitted); *see also Pleasant v. Lovell*, 876 F.2d 787, 796 (10th Cir.

-8-

1989) (noting that an agency relationship may arise "if the government coerces, dominates or directs the actions of a private person"). For the second element, we determine "whether the party performing the search intended to assist law enforcement efforts or to further his own ends." *Souza*, 223 F.3d at 1201 (citation and quotation omitted). Our analysis is made on a case-by-case basis and is guided by the totality of the circumstances surrounding the search. *Id.*; *see also Skinner v. Ry. Executives' Ass'n*, 489 U.S. 602, 614 (1989) (noting that an agency relationship under the Fourth Amendment can be demonstrated if "in light of all the circumstances" the private party "acted as an instrument or agent of the Government").

While this framework has not been explicitly adopted in the Fifth Amendment context, it is nonetheless instructive. Applying a totality of the circumstances approach, courts can consider a variety of factors bearing on the question of agency: (1) the extent of the government's knowledge of, and participation in, the alleged agent's conduct;[1] (2) the alleged agent's motivations;[2]

---

[1] *See Souza*, 223 F.3d at 1201; *United States v. Garlock*, 19 F.3d 441, 443 (8th Cir. 1994) (recognizing "that the government can exercise such control over a private actor that a 'private' action can fairly be attributed to the government for purposes of the Fourth and Fifth Amendment").

[2] *See Souza*, 223 F.3d at 1201.

(3) the presence or absence of coercion as viewed from the suspect's perspective;[3] and (4) other traditional indicia of agency, such as the parties' mutual manifestation of consent, either express or implied, to have the private party act on behalf of the government and the extent of control exercised by the government over the private party's actions.[4]

2.

Here, prison officials acquiesced, indeed enabled, the conversation between Alexander and Sawyer. But that is all. They did not develop the planned encounter, nor suggest any techniques to help Sawyer convince Alexander to provide a statement to the FBI. To the contrary, they explicitly told Sawyer that it was Alexander's prerogative to reinitiate contact with them. Their sole

---

[3] *See Pleasant*, 876 F.2d at 796; *United States v. Franklin*, 704 F.2d 1183, 1190 (10th Cir. 1983) (noting that "a necessary element of compulsory self-incrimination is some kind of compulsion") (quoting *Hoffa v. United States*, 385 U.S. 293, 304 (1966)); *Garlock*, 19 F.3d at 443 (noting that agency can be shown if "the government exercised such coercive power or such significant encouragement that it is responsible for [the agent's] conduct, or that the exercised powers are the exclusive prerogative of the government") (quotation omitted); *cf. Rhode Island v. Innis*, 446 U.S. 291, 300–01 (1980) (concluding "that the *Miranda* safeguards come into play whenever a person in custody is subjected to either express questioning or its functional equivalent," *i.e.*, any police conduct reasonably likely to elicit an incriminating response as viewed from the perspective of the suspect, rather than the intent of the police).

[4] *See United States v. Koenig*, 856 F.2d 843, 848 n.1 (7th Cir. 1988) (noting that common law agency principles are instructive to an agency issue in the Fourth Amendment context); *cf.* Restatement (Third) of Agency §§ 1.01, 1.03 (Tentative Draft No. 2, 2001).

complicity was in placing the inmates in adjoining cells. *See Whitehead v. Cowan*, 263 F.3d 708, 719 (7th Cir. 2001) (finding no *Miranda* violation where a suspect's roommate persuaded him to confess since the court found no evidence to suggest that the police either engaged in a ploy to elicit a confession or otherwise instructed the roommate to ask certain questions); *cf. United States v. Rambo*, 365 F.3d 906, 911 (10th Cir. 2004) (rejecting the government's assertion that the suspect reinitiated questioning because it "ignores [the police officer's] active role in continuing the interview after [the suspect] invoked his rights").

Sawyer admittedly acted for his own benefit. He was both concerned that Alexander's failure to give a statement would lead to a lengthier sentence than if Alexander simply confessed and worried about his own safety, fearing the consequences if he were labeled a snitch. For these reasons, Sawyer independently devised the plan to persuade Alexander to make a statement to the FBI. Surely, the FBI hoped Sawyer would be successful, but Sawyer's purpose was completely divorced from this hope. *See United States v. Gaddy*, 894 F.2d 1307, 1311 (11th Cir. 1990) (finding no agency relationship when suspect's aunt, who was a police officer, persuaded suspect to confess where the aunt "communicated with [police], not to assist the police department in solving a crime, but to protect her nephew"); *cf. Arizona v. Mauro*, 481 U.S. 520, 529

(1987) ("Officers do not interrogate a suspect simply by hoping that he will incriminate himself.").

Nor was the conduct at issue coercive. We recognize some amount of coerciveness is inherent in the prison setting. But from Alexander's perspective, he was chatting with a friend, who was completely honest and never engaged in any deceptive ploys. And—we must emphasize—it was only at Alexander's own initiative that his conversation with the FBI resumed. *See Mauro,* 481 U.S. at 528 (finding no *Miranda* violation where a conversation between a suspect and his wife in the presence of a police officer was recorded since the Court "doubt[ed] that a suspect, told by officers that his wife will be allowed to speak to him, would feel that he was being coerced to incriminate himself in any way"); *Whitehead*, 263 F.3d at 719 (noting that there was nothing about the persuading party's presence "which would make [the suspect] feel that he had to confess to her"); *Snethen v. Nix*, 885 F.2d 456, 459–60 (8th Cir. 1989) (finding no *Miranda* violation where suspect's mother persuaded suspect to confess so her other son would not be unjustly punished since "[i]t was 'coercion' by [suspect's] mother that led to [the suspect's] inculpatory remarks, not by the police") (citing *Connelly*, 479 U.S. at 157)).

-12-

The record supports the district court's conclusions that no agency relationship existed or coercive tactics were employed. FBI Agent Richard Smith described Sawyer's request to speak with Alexander:

> A. And then his second question was, "Well, what about [Alexander]?" And we said, "Well, he didn't want to talk to us." So [Saywer] said, "Well, that's just not right. He's only not talking because it was my deal . . . You know, it's not right that I get . . . whatever benefit there is of a statement and [Alexander] doesn't because he's only not talking because of me."
>
> Q. And that's when he came up with the idea of, "Let me talk to him?"
> A. Yeah. He just said, "Just let me talk to him."

Tr. Def.'s Mot. to Suppress 18.

Alexander admitted he was induced by Sawyer's plea for his safety to reinitiate contact with the FBI:

> Q. Well, why did you change your mind? Why did you decide that you should talk to the FBI?
> A. Because I didn't want to leave [Sawyer], you know, hanging like that, get him in trouble ... [with] people [who would say] he was a rat.

*Id.* at 30.

Alexander further testified:

> Q. You also were worried that after Lonnie Sawyer had talked to the FBI, again, he would be seen as a snitch in the yard; is that right?
> A. Yes, sir.
>
> Q. So you wanted to protect him again?
> A. Yes, sir.
>
> Q. You then told Lieutenant Felstead you were willing to talk to the FBI; is that right?

-13-

A. Yes, sir.

Q. And you – you'd made that choice on your own; didn't you?
A. Yes, sir.

Q. And you wanted to protect Lonnie Sawyer again?
A. Yes, sir.

Q. You also said that you had told Lonnie Sawyer, "You shouldn't ever say anything without your lawyer." Isn't that the advice you gave to him?
A. Yes, sir.

Q. You went back and you spoke to the FBI, though, and you did speak to them and you chose to speak to them without a lawyer, didn't you?
A. Yes, sir.

*Id.* at 32.

These facts show that Sawyer was not acting as an agent of the FBI. An agency relationship does not develop where the government is an incidental beneficiary of another party's actions, even where the government admittedly facilitates the conversation that leads to the suspect's decision to reinitiate questioning. That is the case here. Sawyer's plea to Alexander was for his own benefit. The FBI did not direct or control Sawyer, or otherwise use coercive tactics. And, importantly, nothing from the conversation between Sawyer and Alexander was exploited by the FBI. Alexander simply made a voluntary decision to waive his right to silence. After renewed *Miranda* warnings, Alexander confessed and those statements were used at trial. But because Alexander freely volunteered to make this statement,

-14-

[t]his is not a case . . . where the police failed to honor a decision of a person in custody to cut off questioning, either by refusing to discontinue the interrogation upon request or by persisting in repeated efforts to wear down his resistance and make him change his mind.

*Mosley*, 423 U.S. at 105–06.

Accordingly, we find no violation of Alexander's Fifth Amendment right to remain silent.

## B. Constructive Amendment

Alexander next argues that the district court improperly allowed an additional charge against him by instructing the jury on aiding and abetting.[5] An indictment is "constructively amended if the evidence presented at trial, together with the jury instructions, raises the possibility that the defendant was convicted of an offense other than that charged in the indictment." *United States v. Brown*,

---

[5] The instruction provided:

[I]f the acts or conduct of an agent, employee or other associate of the defendant are willfully directed or authorized by him, *or if a defendant aids and abets another person by willfully joining together with such person in the commission of a crime*, then the law holds a defendant responsible for the acts and conduct of such other persons just as though he had committed the acts or engaged in such conduct himself. . . . Therefore, you are instructed that you may not find a defendant guilty as an aider or abettor of any count charged in the indictment unless you find beyond a reasonable doubt that every element of the offense defined in these instructions was committed by some person or persons, and that the defendant knowingly and willfully participated in its commission.

(emphasis added).

400 F.3d 1242, 1253 (10th Cir. 2005) (internal quotations omitted). More simply,

a constructive amendment occurs when the substance of the indictment is

effectively altered, but not when nonessential factual allegations have been added

or deleted. *Hunter v. New Mexico*, 916 F.2d 595, 599 (10th Cir. 1990). In

reviewing a claim of constructive amendment, we consider the jury instructions as

a whole, reviewing de novo the propriety of any individual jury instruction to

which an objection was made at trial. *United States v. Cooper*, 375 F.3d 1041,

1049 (10th Cir. 2004).

Alexander concedes that this court has not required aiding and abetting to

be charged in an indictment so long as the underlying offense is charged. In

*Cooper*, we held:

> It is well established that aiding and abetting is not an independent
> crime under 18 U.S.C. § 2; it simply abolishes the common-law
> distinction between principal and accessory. Consequently, a defendant
> can be convicted as an aider and abettor even though he was indicted as
> a principal for commission of the underlying offense and not as an aider
> and abettor, providing that commission of the underlying offense is also
> proven.

*Id.* Aiding and abetting, therefore, need not be alleged in the indictment. *See*

*United States v. Scroger*, 98 F.3d 1256, 1262 (10th Cir. 1996) (holding that a

defendant is put on notice that "when more than one person is involved in a

criminal act, the district court may properly submit an aiding and abetting

instruction to the jury, even though it was not charged in the indictment or

-16-

presented at trial"); *United States v. Cueto*, 628 F.2d 1273, 1275–76 (10th Cir. 1980) (noting that a defendant is not unfairly surprised or misled by an aiding and abetting instruction even when not charged in the indictment).

In the face of this precedent, Alexander suggests that these cases are inconsistent with two recent Supreme Court cases on the scope of the Due Process Clause. He points first to *Jones v. United States*, 526 U.S. 227 (1999):

> [U]nder the Due Process Clause of the Fifth Amendment and the notice and jury trial guarantees of the Sixth Amendment, *any fact* (other than prior conviction) *that increases the maximum penalty for a crime must be charged in an indictment*, submitted to a jury, and proven beyond a reasonable doubt.

*Id.* at 243 n.6 (emphasis added); *accord Apprendi v. New Jersey*, 530 U.S. 466, 490 (2000) ("Other than the fact of a prior conviction, *any fact that increases the penalty for a crime beyond the prescribed statutory maximum* must be submitted to a jury, and proved beyond a reasonable doubt.") (emphasis added). Similarly, he argues that *Blakely v. Washington*, 542 U.S. 296 (2004), requires any fact used at sentencing be submitted to a jury and therefore charged in the indictment. Alexander contends that because an aiding and abetting instruction introduces facts, such as the concepts of agency and vicarious liability, that are not elements of the underlying offense, aiding and abetting must be charged in the indictment.

We disagree. In *Jones*, the Supreme Court held that a fact must be charged in the indictment only if it increases *the maximum penalty* for a crime. *Jones*, 526

U.S. at 243 n.6; *accord Apprendi*, 530 U.S. at 490. In that case, the indictment charged carjacking but failed to include a separate charge for carjacking resulting in serious bodily injury. *Jones*, 526 U.S. at 230–31. The Court held that the provisions of the carjacking statute which imposed higher penalties when the offense resulted in serious bodily injury set forth additional elements of the offense which must be charged in the indictment. *Id.* at 252.

That is not the case with aiding and abetting. In contrast to the carjacking crime in *Jones,* a defendant convicted of the charged offense here—assault resulting in serious bodily injury—would be susceptible to exactly the same punishment if he had been convicted of aiding and abetting the predicate offense. Because aiding and abetting does not increase the maximum penalty of the underlying crime charged in the indictment, the failure to charge it does not raise any due process concerns under *Jones*. *Cf. United States v. Creech*, 408 F.3d 264, 273 (5th Cir. 2005) (holding that nothing in the *Apprendi* line of cases "call[s] into question [the] long-standing practice" of giving a jury instruction on aiding and abetting even though such charge was not set forth in the indictment). In short, a charge of the predicate crime puts defendant on notice that the jury may be instructed on aiding and abetting, thus satisfying any due process concerns. *See Scroger*, 98 F.3d at 1262.

This same logic similarly disposes of Alexander's *Blakely* argument. *Blakely* merely reiterates that "[o]ther than the fact of a prior conviction, any fact that increases the penalty for a crime beyond the prescribed statutory maximum must be submitted to a jury, and proved beyond a reasonable doubt." 542 U.S. at 301 (quoting *Apprendi*, 530 U.S. at 490). Aiding and abetting does not increase the penalty beyond that of the predicate crime.

In sum, failure to charge Alexander with aiding and abetting does not violate either the Fifth or Sixth Amendments because it does not constitute a separate crime; it is instead merely a recognized variant of the underlying offense, *i.e.,* assault resulting in serious bodily injury. Therefore, the aiding and abetting instruction here did not introduce facts which increased the maximum penalty for the crime charged, and the instruction was not a constructive amendment of the indictment.

## C. Sufficiency of the Evidence

Finally, Alexander argues the evidence was insufficient to show Howell suffered serious bodily injury. We review sufficiency claims de novo, reversing only if after viewing the evidence in the light most favorable to the prosecution and drawing all reasonable inferences therefrom, no rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt. *United States v. Muessig*, 427 F.3d 856, 861 (10th Cir. 2005). This court accepts a jury's

resolution of conflicting evidence without weighing the credibility of witnesses. *Id.*

A jury may find serious bodily injury if any one of the following facts are shown: (1) a substantial risk of death; (2) extreme physical pain; (3) protracted and obvious disfigurement; or (4) protracted loss or impairment of the function of a bodily member, organ, or mental faculty. 18 U.S.C. § 1365; *see* 18 U.S.C. § 113(b)(2) (referring to § 1365 for the definition of "serious bodily injury").

Testimony at trial revealed the following facts: (1) Howell, upon his arrival at the hospital, was deemed in serious condition; (2) Howell experienced severe pain both immediately after the attack and at the hospital; (3) Howell lost copious amounts of blood; (4) Howell suffered multiple, severe lacerations, including one measuring two and one-half inches in length, which all required medical staples to repair; (5) Howell experienced dizziness for a number of days following the attack; and (6) Howell was hospitalized for two days in order for doctors to monitor whether the attack caused any swelling within his brain.

This evidence, viewed in a light most favorable to the government, is more than adequate to permit a reasonable jury to find that Howell suffered serious bodily injury. Therefore, we affirm the jury's verdict.

## IV. Conclusion

Accordingly, for the reasons stated above, we AFFIRM.