**F I L E D**
**United States Court of Appeals**
**Tenth Circuit**

**April 13, 2007**

**Elisabeth A. Shumaker**
**Clerk of Court**

**UNITED STATES COURT OF APPEALS**

**FOR THE TENTH CIRCUIT**

---

UNITED STATES OF AMERICA,

Plaintiff-Appellee,

v.

JAMES EDWARD MCINTOSH,

Defendant-Appellant.

No. 06-7059
(D.C. No. CR-05-00087-001-P)
(E.D. Okla.)

---

**ORDER AND JUDGMENT**[*]

---

Before **LUCERO**, **McKAY**, and **GORSUCH**, Circuit Judges.

James McIntosh appeals his conviction and 65-month sentence for assault resulting in serious bodily injury in violation of 18 U.S.C. §§ 1153 and 113(a)(6). We **AFFIRM**.

---

[*]      After examining the briefs and appellate record, this panel has determined unanimously to grant the parties' request for a decision on the briefs without oral argument.  See Fed. R. App. P. 34(f); 10th Cir. R. 34.1(G).  The case is therefore ordered submitted without oral argument.  This order and judgment is not binding precedent, except under the doctrines of law of the case, res judicata, and collateral estoppel.  It may be cited, however, for its persuasive value consistent with Fed. R. App. P. 32.1 and 10th Cir. R. 32.1.

# I

Defendant James McIntosh lived with his daughter Misty McIntosh and her infant son Jared, at the home of his aunt, Amy Owings. Owings' home was located within Indian country as defined in 18 U.S.C. § 1151. The McIntoshes are enrolled in the Seminole Nation of Oklahoma, and are considered Indians for purposes of the criminal code.

On the day of the assault, James had been drinking whiskey with Veronica Givens at her home. When Givens drove James back to Owings' home, they encountered Misty and Jared. They agreed to drive Misty to the store, where she purchased a twelve-pack of beer, and the foursome continued on to Givens home. Once there, they began to consume alcohol. By the time they finished drinking, Givens estimated that James had consumed approximately two-thirds or three-fourths of a bottle of whiskey.

Eventually Givens' son, Kevin Givens, drove James, Misty, and Jared back to Owings' residence. During the ride, James and Misty began arguing about Misty's care of Jared. James elbowed Misty in the face and threatened to report her to the Department of Human Services.

Upon arriving at Owings' home, Misty, carrying Jared, immediately headed for the entrance door. James followed, and knocked her and the baby down in the front yard. Misty stood up, entered the house, and safely placed Jared down. Again James followed, this time hitting his daughter and kicking her with his

steel-toed boots in the back and the face. Although she attempted to defend herself, Misty was intoxicated and fell over a piece of furniture. Eventually, Misty grabbed a cell phone and crawled to the front door.[1] James continued hitting and kicking Misty as she crawled. Kevin Givens attempted to get James' attention to no avail. Kevin estimated that during this exchange James hit Misty approximately twenty times. He testified that he had "never seen anything like it before."

Once she exited the house, Misty was able to take hold of James' foot and twist it, throwing him off balance. During this pause in the assault, Misty called 911 and told the police that she was being beaten. The dispatcher asked for her address, but unfortunately Misty did not know it. At this point, Misty fell again. Her long hair became twisted around James' leg and boot, preventing her from raising her head. James began choking her. It is unclear whether Misty dropped the phone or whether James snatched it away from her, but the call abruptly ended. Misty somehow managed to escape James and tried to run away, but, unfortunately, she once again tumbled to the ground. James resumed kicking and punching her. He also threatened to kill her. Momentarily leaving her on the ground, James entered the house and retrieved a hatchet. He returned to where

---

[1] Misty testified that her recollection of this event is unclear, and that James may have dragged her through the front door.

Misty was lying, raised the hatchet above his head, and yelled: "I'm going to kill you, bitch!"

The altercation awoke Owings. She collected her car keys, retrieved Jared, and proceeded to her car. When she started the vehicle, James turned towards the sound. Misty used this distraction to flee. She entered the car, and Owings drove off. After Owings dropped Jared off with his maternal grandparents, Misty was taken to a hospital. During the ride, Misty could not see due to the swelling and blood in her eyes and could barely hear due to the blood running into her ears. When they arrived at the hospital, Misty described her pain to hospital personnel as "ten" on a zero-to-ten scale. Due to the nature of her injuries, Misty had to undergo x-rays and a CAT scan, preventing hospital personnel from giving her any pain medication because of the possible effects such medication would have on the tests.

Misty was then transferred by helicopter to the University of Oklahoma Medical Center in Oklahoma City. Dr. Jeffrey Bender, who treated Misty at the Center, testified that she had multiple fractures of her facial bones. Photographs taken at the hospital and presented to the jury showed Misty with her eyes swollen shut, her lips and face bloodied, and her face and body covered in bruises. One bruise on her back appeared to bear the outline of a boot. Misty was released later that day. She testified that the swelling subsided about a week and a half later and that she was on pain medication for a month.

James was arrested and charged with assault resulting in serious bodily injury in violation of 18 U.S.C. § 1153.  In February 2006, a jury trial was held.  Misty, her mother, and her brother all testified to prior incidents in which James assaulted or attacked Misty.  BIA Police Officer Randy Wesley testified regarding James' confession to the crime.  At the close of the government's case, James moved for a judgment of acquittal, which was denied.  After presenting his case, James again moved for a judgment of acquittal, and his motion was again denied.  The jury convicted James.  However, the jury responded in the negative to the following special interrogatory:  "If you find the defendant guilty, you should answer the following question:  Do you unanimously find the government proved beyond a reasonable doubt that the defendant brandished or threatened the victim with a dangerous weapon (steel-toed boots and/or hatchet)."

The presentence report calculated a base offense level of 14.  A four-level increase was applied for use of a dangerous weapon under U.S.S.G. § 2A2.2(b)(2)(B) and a five-level increase was added because the crime resulted in serious bodily injury under U.S.S.G. § 2A2.2(b)(3)(B), yielding a total Guidelines offense level of 23.  Based on James' criminal history category of III, the recommended Guidelines range was 57-71 months' imprisonment.  Defendant filed objections to both of the offense level enhancements.  The district court rejected these challenges, and sentenced James to 65 months' imprisonment.

## II

## A

James argues the district court improperly admitted evidence pursuant to Federal Rule of Evidence 404(b) regarding his violent conduct toward Misty after he consumed alcohol during the Summer of 2003. We review the district court's evidentiary rulings for abuse of discretion. See United States v. Mares, 441 F.3d 1152, 1156 (10th Cir. 2006). "We will not reverse a district court's ruling [admitting such evidence] if it falls within the bounds of permissible choice in the circumstances and is not arbitrary, capricious or whimsical." Id. (quotations and alterations omitted).

Federal Rule of Evidence 404(b) provides:

Evidence of other crimes, wrongs, or acts is not admissible to prove the character of a person in order to show action in conformity therewith. It may, however, be admissible for other purposes, such as proof of motive, opportunity, intent, preparation, plan, knowledge, identity, or absence of mistake or accident . . . .

In weighing the admissibility of evidence under Rule 404(b), we ask whether: (1) the evidence is offered for a proper purpose; (2) it is relevant; (3) the probative value of the evidence is substantially outweighed by its prejudicial effect under Rule 403; and (4) a proper limiting instruction was given, if requested by the defendant. See Huddleston v. United States, 485 U.S. 681, 691-92 (1988).

-6-

During defense counsel's opening statement, counsel suggested that Misty had a reputation for possessing knives and that Kevin Givens had been convicted of a violent crime. Defense counsel also suggested that the defendant may not have caused Misty's injuries, or, alternatively, he may have been acting in self-defense. In response, and over defendant's objection, the government introduced testimony from three witnesses – Misty, her mother, and her brother – establishing that in the summer of 2003 James had assaulted Misty after consuming alcohol. During that attack, he gave her a black eye, split her lip, and choked her. Following each witness' testimony, the district court issued a limiting instruction, informing the jury that evidence of the prior incident could be used only to establish James' motive, knowledge, intent, common scheme, or absence of mistake or accident. See Fed. R. Evid. 404(b).

This evidence was both relevant and proper to show defendant's intent and lack of mistake or accident in assaulting Misty. James claims that the evidence was unfairly prejudicial under Rule 403 because three witnesses testified regarding the same incident, rendering the testimony cumulative. However, multiple witnesses were presented in response to James' claim that the witnesses, including Misty, were not credible. We conclude that the district court's decision to admit testimony from three witnesses regarding the incident was not "arbitrary, capricious or whimsical" or "outside the bounds of permissible choice." See Mares, 441 F.3d at 1156.

**B**

James argues that the government failed to introduce sufficient evidence that Misty suffered "serious bodily injury" as that term is used in 18 U.S.C. § 1153. "We review the sufficiency of the evidence to support a jury's verdict de novo." United States v. Lewis, 240 F.3d 866, 870 (10th Cir. 2001). This court asks "whether taking the evidence – both direct and circumstantial, together with the reasonable inferences to be drawn therefrom – in the light most favorable to the government, a reasonable jury could find the defendant guilty beyond a reasonable doubt." United States v. Hanzlicek, 187 F.3d 1228, 1239 (10th Cir. 1999).

"[S]erious bodily injury" is defined in 18 U.S.C. § 1153 by reference to 18 U.S.C. § 1365. As the jury was instructed, "serious bodily injury" is a bodily injury which involves "(A) a substantial risk of death; (B) extreme physical pain; (C) protracted and obvious disfigurement; or (D) protracted loss or impairment of the function of a bodily member, organ, or mental faculty[.]" § 1365(h)(3). The government may satisfy its burden of proving serious bodily injury by showing the presence of any one of these conditions. United States v. Alexander, 447 F.3d 1290, 1299 (10th Cir. 2006).

When read in the light most favorable to the government, the record contains substantial evidence that supports the jury's verdict. Although the government did not introduce medical records detailing her hospital visits, both

the nurse that originally attended to Misty and the doctor that saw her when she was taken to the Oklahoma City hospital testified regarding her extensive injuries. Several bones in her face were fractured, and her eyes were swollen shut. Bruises covered many parts of her body.[2] For approximately a month after the assault Misty required pain medication. This evidence was plainly sufficient to permit a reasonable jury to find that Misty suffered serious bodily injury.

### III

James raises a number of challenges to his sentence based on the Supreme Court's decision in United States v. Booker, 543 U.S. 220 (2005). In evaluating sentences under Booker, this court reviews legal questions de novo and factual findings for clear error, "giving due deference to the district court's application of the guidelines to the facts." United States v. Doe, 398 F.3d 1257, 1257 (10th Cir. 2005).

### A

James contends that the district court improperly applied U.S.S.G. § 2A2.2(b)(2)(B) to enhance the base offense level by four-levels to account for use of a dangerous weapon, the steel-toed boots, given that the jury expressly acquitted him of using a dangerous weapon. We recognize that the jury

---

[2] Defendant claims that because Misty's injuries did not require "stitches, staples or sutures" she did not suffer serious bodily injury. We reject this argument outright. Only because of fortuity, even more serious injury did not follow the repeated blows delivered by James.

determined, by special interrogatory, that the government had not proved beyond a reasonable doubt that James threatened Misty with a dangerous weapon, i.e. steel-toed boots or a hatchet. However, James misunderstands the post-Booker sentencing scheme.

In Booker, the Court held that "the mandatory application of the Guidelines violates the Sixth Amendment when judge-found facts, other than those of prior convictions, are employed to enhance a sentence." United States v. Gonzalez-Huerta, 403 F.3d 727, 731 (10th Cir. 2005) (en banc). When the judge does not apply the Guidelines mandatorily, we stated:

> [W]hen a district court makes a determination of sentencing facts by a preponderance test under the now-advisory Guidelines, it is not bound by jury determinations reached through application of the more onerous reasonable doubt standard. In this respect, the prior Guidelines scheme is unchanged by the seeming revolution of Booker.

United States v. Magallanez, 408 F.3d 672, 685 (10th Cir. 2005).

Although James claims the district court mandatorily applied the Guidelines, he does not offer any argument why we should consider the district court's imposition of his sentence a mandatory application of the Guidelines.[3] Thus, our inquiry is simply whether the district court's factual finding that James

---

[3] To the extent James contends that the district court mandatorily applied the Guidelines because he calculated a Guidelines range and imposed a Guidelines sentence, he again misconceives the post-Booker sentencing jurisprudence. Although district courts are not bound by the Guidelines, they are "still required to [calculate] and consider Guideline ranges." Magallanez, 408 F.3d at 685.

threatened or brandished a dangerous weapon – steel-toed boots – was clear error. Based on our review of the record, the district court's finding that the defendant was wearing steel-toed boots when he assaulted Misty is supported by a preponderance of the evidence. Specifically, the defendant confessed to this fact, and that confession was read before the jury. The jury's answer to the special interrogatory merely shows that it determined the government did not carry its burden of proof regarding this issue. Therefore, the district court's application of U.S.S.G. § 2A2.2(b)(2)(B), finding that based on a preponderance of the evidence James threatened or brandished a dangerous weapon, did not violate James' Sixth Amendment rights.

**B**

James also argues that his sentence is procedurally unreasonable under Booker because the district court improperly viewed his objection to the PSR's recommendation as a request for a downward departure under the Guidelines, rather than a request for a variance under § 3553(a). "Post-Booker, we review sentencing decisions for reasonableness, which has both procedural and substantive components." United States v. Atencio, ___F.3d___, No. 05-2279, 2007 WL 102977, at *6 (10th Cir. Jan. 17, 2007). A sentence is procedurally unreasonable when the district court fails to properly calculate the advisory Guidelines range or misapplies the factors set forth in § 3553(a). Id. Although there has been some confusion in our precedent regarding what is properly

-11-

considered a variance and what should be termed a departure, we recently clarified the proper use of this terminology in Atencio:

> when a court reaches a sentence above or below the recommended Guidelines range through application of Chapters Four or Five of the Sentencing Guidelines, the resulting increase or decrease is referred to as a "departure." When a court enhances or detracts from the recommended range through application of § 3553(a) factors, however, the increase or decrease is called a "variance."

Id.

Although it appears the district court did improperly characterize James' objection to the PSR as a request for a departure rather than a variance, James did not complain of this procedural confusion between a departure and a variance at the time of his sentencing. Thus, we review only for plain error. United States v. Lopez-Flores, 444 F.3d 1218, 1221 (10th Cir. 2006), petition for cert. filed (No. 06-5217 July 7, 2006). "Plain error occurs when there is (1) error, (2) that is plain, which (3) affects substantial rights, and which (4) seriously affects the fairness, integrity, or public reputation of judicial proceedings." Id. at 1222 (quotation omitted). Defendants carry "the [ ] burden to persuade the court that the error 'seriously affect[ed] the fairness, integrity[,] or public reputation of judicial proceedings.'" United States v. Brown, 316 F.3d 1151, 1161 (10th Cir. 2003) (citation omitted).

James attempts to persuade us that the district court would have imposed a lower sentence had it analyzed his claim properly as a request for a variance under the § 3553(a) factors. In support, he tells us that his stepfather is a blind veteran whom he helped care for, and refers to a letter the jury sent to chambers during deliberations requesting that James not be imprisoned.[4] Judge Payne rejected the jury's request, and considering the record, we entirely agree with

---

[4] This letter reads:

> Your Honor, we the [j]ury, totally understand that the dispensation of the punishment for this [i]ndictment does not fall within our jurisdiction.
> Sir, the collective Heart of this Jury cries out, even demands, that we speak.
> We the Jury do not wish to send Mr. McIntosh to jail. We feel that this would not serve justice in this case.
> We believe that there is great love in Mr. McIntosh[']s family. We also believe that the family is fragmented but because of the love there is the possibility of hope.
> Our suggestions hinge on this hope.
> We would suggest:
> 1 – mandatory alcohol abuse [s]chool
> 2 – mandatory anger management
> Your honor, we would also like to address Mr. McIntosh directly:
> Mr. McIntosh,
> You have a God given responsibility to lead your family.
> You can be a bad leader who leads by fear, hurt, pain & suffering which leads to hate & anger or you can be a good leader who leads in love with compassion, forgiveness and abundant grace.
> You have the power to lead either way. Sincerely the [j]ury

-13-

his decision.  We can neither say that the district court committed plain error nor that the defendant's sentence was substantively unreasonable.

## IV

**AFFIRMED**.

Entered for the Court


Carlos F. Lucero
Circuit Judge