

# IN THE MISSOURI COURT OF APPEALS
# WESTERN DISTRICT

| | | |
|---|---|---|
| STATE OF MISSOURI, | ) | |
| | ) | |
| Respondent, | ) | |
| | ) | |
| v. | ) | WD86932 |
| | ) | |
| MICHAEL W. MYERS, | ) | Opinion filed: July 29, 2025 |
| | ) | |
| Appellant. | ) | |

**APPEAL FROM THE CIRCUIT COURT OF CLAY COUNTY, MISSOURI**
**HONORABLE DAVID P. CHAMBERLAIN, JUDGE**

Division Two: Lisa White Hardwick, Presiding Judge,
Edward R. Ardini, Jr., Judge and W. Douglas Thomson, Judge

Michael W. Myers ("Myers") appeals the judgment of the Circuit Court of Clay County, entered on a jury verdict, convicting him of one count of first-degree murder, one count of first-degree assault, and two counts of armed criminal action. On appeal, Myers contends the circuit court plainly erred in submitting a verdict-directing instruction for first-degree murder containing a variance from the charging instrument that was material and prejudicial, and resulted in plain error because it affected the jury's verdict. Myers also contends (and the State concedes) that the circuit court plainly erred in entering a written judgment that materially differed from the sentences orally pronounced. For the reasons set forth below, we reverse and remand for a *nunc pro tunc* amendment to conform

the written judgment to the orally pronounced sentences, and affirm the judgment in all other respects.

## Factual and Procedural Background

Myers does not challenge the sufficiency of the evidence supporting his convictions. In the light most favorable to the verdicts, the evidence established that V.C. had known J.P. since 2014 and Myers since 2017 and was residing with Myers in Riverside, Missouri, while J.P. was in prison. V.C. left Myers's home to be with J.P. upon his release from prison and took with her a scooter that Myers had given her.

On April 8, 2019, at approximately 3:29 p.m., Myers sent J.P. a Facebook message which read, in part:

> If she wasn't with you, she wouldn't have no reason to hide from me because we were getting along just fine before you two talked after I dropped you off. Don't worry, I ain't mad. To show me just a big A-C*** she is when she got out. I know how you feel at time now. It sucks the way she treats the guy she is supposed to be going out with and how great all the other guys are when she talks about them made me feel like s***. And that's how she treated me, like s***. You know damn well I took care of that b****. She's a f*****' loser, and I know I've said it before, but f*** her, I don't want to feel like she makes me feel anymore. For real, it sucked.

At approximately 3:37 p.m., Myers sent J.P. another message which stated: "She hasn't even messaged or anything to say f*** me, or that scooter is fine or nothing. I about had her a** the other day and she didn't even know it. I'm going to run it over when I see it."

The following day, April 9, 2019, J.P. and V.C. were sitting on a concrete stoop in front of a thrift store in Gladstone, Missouri. J.P. had recently returned on V.C.'s scooter with food from J.P.'s mother's home. V.C. looked up when she heard a truck "peel[] out" after passing by them. She recognized the truck as Myers's white Dodge pickup. She

2

observed Myers driving and no one else in the truck.  V.C. heard Myers say, "There she is."  Myers "then backed up and came right at us."  V.C. testified, "He come at us both while we were sitting on the stairs."

A nearby home was equipped with a camera that faced the thrift store.  The camera captured the crime and the video was admitted at trial.  V.C. identified the white Dodge pickup in the camera footage as belonging to Myers.

A man ("Neighbor") living in a home across from the thrift store testified that he heard tires squealing and saw a white Dodge truck backing out of the thrift store parking lot and speeding away.  Neighbor then observed a man and woman in distress.  The man was motionless and appeared unconscious.  The woman was attempting to get the man up and was yelling his name.  The woman, V.C., indicated to neighbor that she knew who had struck them and stated to police that it was "Mike Myers."

V.C. suffered a laceration to her forehead and an abrasion on her knee.  She was transported to North Kansas City Hospital where she received stitches and staples in her head.  At the time of trial, she had a visible scar on her forehead which extended to her hairline.

J.P. was pronounced dead at the scene.  An autopsy revealed that he suffered multi-focal bilateral rib fractures to both the front and back ribs, and a punctured right lung.  He had blood in the cavity between the membrane lining and the lungs, lacerations to the lungs, liver, and spleen, and blood in the abdominal cavity.  He had fractured dislocations of the right and left clavicle shoulder blades.  Ultimately, the multiple rib fractures led to rapid exsanguination, or bleeding to death, within the chest cavity.

3

An investigation of the crime scene revealed tire tracks leading to the steps where J.P. and V.C. had been sitting, and damage to the railing on the stoop. Blood appeared to be on the steps. Rubber collected at the scene was forensically determined to have come from a tire on Myers's truck.

Around midnight on April 10, 2019, Myers corresponded with K.M. via Facebook Messenger:

**Myers**:      I need someone to come down and pick up my ride.

**K.M.**:      Where are you at? What's wrong?

**Myers**:      Nothing, just need it out of here ASAP.

**K.M.**:      Okay, where are you at?

**Myers**:      About to leave from downtown but my ride will be in the alley down from my work. Keys will be in the gas door.

**K.M.**:      Okay, bro-bro, you want to take it to Elliott's?

**Myers**:      That will be fine.

**K.M.**:      You got a wild one or you've been drinking. LOL.

**Myers**:      I'm shutting down this phone, okay. It will be all the way to the end of alley.

Myers's father owned a car dealership on Truman Road in Independence, Missouri, where Myers was a mechanic. B.S. had been a mechanic there with Myers in early 2019, and was working for a towing company in Gladstone, Missouri, in April 2019. On April 10, 2019, Myers called B.S. asking if he could tow Myers's truck to B.S.'s nephew's shop due to an issue with the truck's brakes. B.S. towed Myers's truck to the shop that evening, as B.S. was not allowed to "do personal tows through the daytime."

4

B.S.'s nephew ("Shop Owner") testified that he arrived at his shop one morning in April 2019 and saw a white Dodge truck in the back. The truck had damage to the front driver's side. He was told by B.S. that it was Myers's truck and needed brake work. After receiving a phone call that Myer's truck had been involved in a crime, and viewing online news reports that the truck was wanted by the Gladstone police, Shop Owner called law enforcement.

Police towed the vehicle and a search warrant was executed. The truck had damage to the driver's side of the hood, as well as to the front panel, quarter panel, and bumper. The truck lacked a rear license plate, had duct tape on the left headlight and zip ties attached to the bumper. Hair found on the bumper was collected and turned over to the crime lab. There was damage to the suspension system and mud flap and a portion of tire tread was missing. Mail inside the truck was addressed to Myers.

Phone records revealed that on the evening of April 9, 2019, Myers's cell phone was in the vicinity of Myers's workplace between 6:33 p.m. to 6:39 p.m. At 7:04 p.m., the phone was in the general vicinity of the crime scene. At approximately 7:11 p.m., the phone appeared to be moving toward Myers's father-in-law's home. At 7:50 p.m., the phone was again in the area of his workplace.

Video footage from the father-in-law's home showed Myers arrive in his white truck at about 7:17 p.m. on April 9, 2019. Myers's father-in-law had seen Myers's truck a couple of days earlier and observed no damage to the front of the vehicle.

DNA testing revealed that a hair root found on the bumper of Myers's truck belonged to V.C. DNA on the steering wheel showed four contributors, one major and three minor. Myers was the major contributor, and J.P. and V.C. were minor contributors.

Officers found Myers at his place of employment on April 10, 2019. When police arrived, Myers attempted to flee. Myers was arrested and agreed to speak with officers. He initially denied owning a Dodge Ram truck before claiming that he had sold the truck to his employer's car lot where it had been stolen a couple of days earlier.

On April 12, 2022, Myers was charged by indictment with first-degree murder (Count I) for, after deliberation, knowingly causing the death of J.P. by striking him with a vehicle; armed criminal action (Count II) for committing first-degree murder with a dangerous instrument; first-degree assault (Count III) for knowingly causing serious physical injury to V.C. by striking V.C. with a vehicle; and armed criminal action (Count IV) for committing first-degree assault against V.C. with a dangerous instrument.

Trial was held October 16-18, 2023. Myers was convicted of each charged offense and was sentenced to life in prison without the possibility of parole on Count I, fifteen years on Count II, life in prison on Count III, and fifteen years on Count IV. The circuit court orally pronounced that Counts II, III, and IV were to run consecutive to Count I, but did not pronounce that the sentences for Counts II, III, and IV were to run consecutive to each other. The written judgment and docket entry state that the sentences for all four counts are to run consecutive to each other. This appeal follows.

\

6

## Standard of Review

Myers concedes that his points on appeal are not preserved for appellate review and requests plain error review. "Whether an unpreserved claim is statutory, constitutional, structural, or of some other origin, Rule 30.20 is the exclusive means by which an appellant can seek review of any unpreserved claim of error and said claim ... is evaluated by this Court's plain error framework without exception." *State v. Mills*, 687 S.W.3d 668, 675 (Mo. banc 2024) (internal quotation marks and citation omitted).

"Plain error review is discretionary." *Id.* "[T]he defendant bears the burden of demonstrating manifest injustice entitling him to plain error review." *State v. Brandolese*, 601 S.W.3d 519, 526 (Mo. banc 2020) (internal citations and quotation marks omitted). "Unless manifest injustice or a miscarriage of justice is shown, an appellate court should decline to review for plain error under Rule 30.20." *Id.*

In conducting plain error review, the Court conducts a two-step process:

The first step requires a determination of whether the claim of error facially establishes substantial grounds for believing that manifest injustice or miscarriage of justice has resulted. All prejudicial error, however, is not plain error, and plain errors are those which are evident, obvious, and clear. If plain error is found, the court then must proceed to the second step and determine whether the claimed error resulted in manifest injustice or a miscarriage of justice.

*Mills*, 687 S.W.3d at 675. *Id.* (internal quotation marks and citation omitted).

"Instructional error rarely rises to the level of plain error." *State v. Scott*, 278 S.W.3d 208, 212 (Mo. App. W.D. 2009). For a defendant to establish plain error from an instructional error, the defendant "must show more than mere prejudice and must show that the circuit court has so misdirected or failed to instruct the jury that it is apparent to the

7

appellate court that the instructional error affected the jury's verdict, and caused manifest injustice or miscarriage of justice." *Id.* (internal citation and quotation marks omitted).

### Point I – Alleged Variance

In his first point on appeal, Myers contends the circuit court plainly erred by submitting to the jury a verdict-directing instruction for first-degree murder that contained a variance from the charging instrument, arguing the variance was fatal because it was material and prejudicial, and resulted in plain error because it affected the jury's verdict. Myers contends that he was charged with first-degree murder on the basis that he "knowingly caused the death of [J.P.] by striking him with a vehicle," but the verdict director modified the charged *mens rea* element to a theory of transferred intent requiring a finding that, in striking J.P. with his vehicle, it was Myers's "purpose to cause the death of [V.C.]." Myers argues that this variance was fatal because it denied him adequate notice of the evidence that would be presented at trial and that this detrimentally impacted his ability to defend against the charge.

"Instructions which are at variance with the charge or which are broader in scope than the evidence are improper unless it is shown that an accused is not prejudiced thereby." *State v. Glass*, 136 S.W.3d 496, 520 (Mo. banc 2004) (internal quotation marks and citation omitted). "A variance is not fatal, and will not require reversal, unless it submits a new and distinct offense from that with which defendant was charged." *Id.* A variance must be both material and prejudicial to warrant reversal. *Id.* "Variances are material when they affect whether the accused received adequate notice; variances are prejudicial when they affect the defendant's ability to defend against the charges." *Id.* (internal quotation marks

8

and citation omitted). A defendant must show that he or she would have been better able to defend against the charges if the charging document had contained the same language as the verdict director. *State v. Tillman*, 289 S.W.3d 282, 292 (Mo. App. W.D. 2009). When a crime may be committed by various methods, the verdict directing instruction must submit the method alleged in the charging instrument. *Id.* This allows for the accused to prepare an adequate defense against the specific charge. *Id.*

Myers was charged with first-degree murder. Pursuant to Section 565.020,[1] "[a] person commits the offense of murder in the first degree if he or she knowingly causes the death of another person after deliberation upon the matter."

Myers's indictment for first-degree murder read, in pertinent part:

> The Grand Jurors of the County of Clay, State of Missouri, charge that the defendant, in violation of Section 565 020, RSMo, committed the class A felony of murder in the first degree punishable upon conviction under Section 565 020, RSMo, in that on or about April 9, 2019, in the County of Clay, State of Missouri, the defendant after deliberation, knowingly caused the death of [J.P.] by striking him with a vehicle.

The verdict director for Myers's first-degree murder count read:

> As to Count I, if you find and believe from the evidence beyond a reasonable doubt:
>
> > First, that on or about April 9, 2019, in the State of Missouri, the defendant caused the death of [J.P.] by striking him with a vehicle, and
> >
> > Second, that it was the defendant's purpose to cause the death of [V.C.], and

---

[1] All statutory references are to the Revised Statutes of Missouri, 2016, unless otherwise noted.

Third, that defendant did so after deliberation, which means cool reflection upon the matter for any length of time no matter how brief, and

Fourth, that defendant was eighteen years of age or older at the time of the offense, and

then you will find the defendant guilty under Count I of Murder in the First Degree.

However, unless you find and believe from the evidence beyond a reasonable doubt each and all of these propositions, you must find the defendant not guilty of Murder in the First Degree.

The verdict director did not submit a new and distinct offense from the charging document, as both identified first-degree murder as the offense. Nor did the verdict director submit an alternate method by which Myers committed the murder, as both identified the method as striking J.P. with a vehicle.

Myers nevertheless argues that a material variance existed because the verdict director modified the intent element. He asserts that the State's failure to charge him with its ultimate theory of transferred intent (i.e., that, while intending to kill V.C. with his vehicle, he killed J.P.) provided him inadequate notice of the intent element being pursued by the State related to the first-degree murder charge and the evidence that would be presented at trial in support of that element. Myers notes that the State used his Facebook message to J.P. that, "I about had her a** the other day and she didn't even know it. I'm going to run it over when I see it," to prove the *mens rea* component of the offense submitted to the jury. He states that, while he "likely anticipated the Facebook messages would be used as evidence of his connection with the incident, he would not have necessarily anticipated that the messages could be used to establish the *mens rea* element

10

charged." He argues that, had the charging document revealed that the State would rely on transferred intent to prove his guilt, he would have placed additional focus during trial preparation on challenging the admissibility of the Facebook messages and/or in arguing the messages were not from his Facebook account.

Unlike *State v. Borst*, 643 S.W.3d 586 (Mo. App. W.D. 2022), wherein we found a fatal variance between the charging instrument and verdict director due to there being two distinct ways to commit "conventional" second-degree murder (with each requiring a different mental state), and the defendant was charged with one and convicted of the other, there is only one form of murder in the first degree. The *mens rea* for first-degree murder requires knowingly causing the death of a person after deliberation. § 565.020.

"The culpable mental state necessary for a homicide offense may be found to exist if the only difference between what actually occurred and what was the object of the offender's state of mind is that a different person or persons were killed." § 565.003.1(1). This is true even when the identity of the person the offender intended to kill cannot be established. § 565.003.1(2). Where the State proves beyond a reasonable doubt that the offender had the requisite mental state toward a specific person or a general class of persons who are not identified, the intent "shall be transferred to a person who is killed by the offender while such mental state existed." *Id.* Thus, the doctrine of transferred intent under section 565.003.1 does not "modify" the intent element otherwise required to prove first-degree murder, but merely provides the State with an alternative means of proving the intent element. The doctrine of transferred intent "has been recognized in Missouri for more than a century, and there is no question but that it operates to 'transfer' both the

11

defendant's deliberation and his intent." *State v. Nathan*, 404 S.W.3d 253, 267 (Mo. banc 2013).

By virtue of Section 565.003.1, Myers was on notice that he could be convicted of first-degree murder on a transferred intent theory if the facts warranted. Given this, and the factual circumstances surrounding the crime, it was reasonable for Myers to have anticipated that the State would pursue a transferred intent theory and that the Facebook messages would be used to establish the *mens rea* element.

Under MAI-CR 414.02's Supplemental Notes on Use, if the State's theory of guilt is based on transferred intent and that theory is supported by the evidence, the verdict director for first-degree murder must be modified to reflect that theory. The modification does not change any elements of the offense, and any verdict director for first-degree murder requires proof of deliberation related to the intent to kill a person. Transferred intent is a recognized variant of the underlying offense.[2]

Moreover, even assuming the presence of a material variance between the charging document and verdict director, which we do not find, Myers's claim of error would fail

---

[2] The analysis here is similar to that of accomplice liability. "If an accomplice has a purpose to promote an offense, [the accomplice] has acquired the requisite culpable state of mind for that offense." *State v. Isa*, 850 S.W.2d 876, 899 (Mo. banc 1993). "An indictment or information may charge a defendant either as a principal or as an aider and encourager with the same legal effect. It is proper to submit to the jury a theory of accomplice liability despite charging the defendant as a principal." *Id.* at 898 (internal citations omitted). Convicting a person of aiding and abetting the commission of an offense, when the individual was charged as a principal, has been held to "not violate due-process notice principles, on the theory that a conviction based on accessory liability 'does not constitute a separate crime; it is instead merely a recognized variant of the underlying offense.'" *State v. Hendren*, 524 S.W.3d 76, 82 (Mo. App. W.D. 2017) (quoting *United States v. Alexander*, 447 F.3d 1290, 1299 (10th Cir. 2006).

because he makes no showing of prejudice. Myers's defense at trial was that V.C. was not a credible witness, told conflicting stories, and that the truck that killed J.P. was driven by someone other than Myers.[3] Had the jury believed Myers's defense, it would have been sufficient to disprove the offense as both charged and submitted to the jury.[4] A material variance is not prejudicial when the "defense at trial, if believed by the jury, was adequate to disprove the method submitted in the information and the method submitted in the instruction." *State v. Lee*, 841 S.W.2d 648, 651 (Mo. banc 1992).[5]

Myers makes no effort to discuss his actual trial defense in his briefing to this Court, and his argument that he would have focused more trial preparation on challenging the Facebook messages had the charging document put him on notice of the State's transferred intent theory related to the first-degree murder charge is unavailing.

Myers was facing life in prison on the first-degree assault charge that alleged he knowingly caused serious physical injury to V.C. by striking her with his vehicle. As the

---

[3] On cross-examination of V.C. at trial, the defense established that V.C. had submitted an affidavit (which Myers's family asked her to complete and his sister or mother was present when she did so) asserting that it was not Myers's truck that hit her. Further, that V.C. subsequently told police and J.P.'s mother that it was E.K. who hit her and J.P. The defense elicited testimony from V.C. that she identified Myers as the driver because, at the time of the incident, he was the only person she knew with a white truck. The defense also established that thirty-seven-year-old V.C. was a drug addict who began using drugs when she was fourteen.

[4] Myers does not challenge the sufficiency of the evidence to support his convictions either as charged in the indictment or as submitted in the verdict directors.

[5] *See also State v. Parkhurst*, 845 S.W.2d 31, 35 (Mo. banc 1992), wherein the Missouri Supreme Court "held that the *omission* of the required mental state [in the charging document] was not a fatal defect because, in the circumstances of that case, it did not adversely affect the preparation of a defense and it did not prejudice the defendant." *State v. Madison*, 997 S.W.2d 16, 19 (Mo. banc 1999) (emphasis original).

Facebook messages Myers sent J.P. evidenced his motive and intent with regard to the first-degree assault charge, there is no reasonable likelihood that the failure to include transferred intent in the charging document on the first-degree murder charge caused Myers to approach the Facebook evidence differently during trial preparation.

Further, the Facebook messages also contained communications Myers had with K.M. Shortly after using his truck to assault V.C. and kill J.P., Myers messaged K.M. that he needed his truck "out of here ASAP," and that Myers would be "shutting down" his phone. Myers should have anticipated the State would use these messages as evidence of Myers's consciousness of guilt to each of the charged offenses, evidence of contradictory statements he made to law enforcement regarding his truck, and evidence of his attempt to conceal and/or dispose of the murder/assault weapon.[6]

Thus, Myers has failed to facially establish substantial grounds for believing that a manifest injustice or miscarriage of justice resulted from any differences in the indictment for first-degree murder and the verdict-directing instruction submitted to the jury.

Myers's first point on appeal is denied.

**Point II – Written Judgment Differs from Oral Pronouncement**

In his second point on appeal, Myers contends that the circuit court plainly erred in entering a written judgment that materially differs from the oral pronouncement of the

---

[6] Myers provided law enforcement with his cell phone number during his interview about the crimes. Myers subsequently discussed his Facebook account during recorded phone calls from jail. Law enforcement obtained a search warrant and was able to link the Facebook account to the cell phone number Myers had given during his interview.

sentences imposed. He requests remand to the circuit court for entry of a *nunc pro tunc* amendment accurately memorializing the oral pronouncement of sentence. The State concedes this point.

If a court fails to specify in an oral pronouncement whether a sentence is to run consecutively to or concurrently with another sentence, the sentences are to run concurrently. § 558.026.1[7]; Rule 29.09.[8] The written judgment of the trial court should reflect its oral pronouncement of sentence. *State ex rel. Zinna v. Steele*, 301 S.W.3d 510, 514 (Mo. banc 2010) (overruled on other grounds). Where an oral pronouncement materially differs from the written judgment, the oral pronouncement controls. *State v. Robinson*, 685 S.W.3d 32, 34 (Mo. App. W.D. 2024). A written judgment that does not conform to the trial court's oral pronouncement of sentence contains clerical errors that may be corrected *nunc pro tunc*. *State v. Denham*, 686 S.W.3d 357, 371 (Mo. App. W.D. 2024).

Myers was sentenced to life in prison without the possibility of parole on Count I, fifteen years on Count II, life in prison on Count III, and fifteen years on Count IV. The court orally pronounced that Counts II, III, and IV were to run consecutive to Count I, but was silent as to whether Counts II, III, and IV would run consecutively to or concurrently

---

[7] With exceptions inapplicable here, Section 558.026.1 states that, "Multiple sentences of imprisonment shall run concurrently unless the court specifies that they shall run consecutively[.]"

[8] "The court, when pronouncing sentence, shall state whether the sentence shall run consecutively to or concurrently with sentences on one or more offenses for which defendant has been previously sentenced. If the court fails to do so at the time of pronouncing the sentences, the respective sentences shall run concurrently."

with each other. Pursuant to Section 558.026.1 and Rule 29.09, they "shall run concurrently." The court's written judgment states that Counts II, III, and IV each "run consecutive to all other charges." This materially differs from the court's oral sentencing pronouncement.

The circuit court plainly erred in entering a written judgment that materially differs from its oral pronouncement, requiring remand for entry of a *nunc pro tunc* amendment which correctly memorializes the oral pronouncement.

Myers's second point on appeal is granted.

## Conclusion

We reverse the circuit court's judgment to the extent that it failed to properly memorialize the oral pronouncement of sentence, and remand for entry of a *nunc pro tunc* amendment which states that the sentences for Counts II, III, and IV are to run concurrent to each other, but consecutive to Count I. The judgment is affirmed in all other respects.

_____
EDWARD R. ARDINI, JR., JUDGE

All concur.

16